1  William I. Chamberlain
   770 5th St NW APT 1013
2  Washington, DC 20001

3  *In pro per*



4

                    UNITED STATES DISTRICT COURT
5
                   NORTHERN DISTRICT OF CALIFORNIA
6
                          OAKLAND DIVISION
7

8  CLAIRE DELACRUZ, individually, and on behalf of    Case No. 4:11-cv-03532-CW
   herself and all others similarly situated,         **CLASS ACTION**
9
10                    Plaintiff,                       **OBJECTION TO PROPOSED
                                                       SETTLEMENT AND FEE REQUEST AND
11       v.                                            NOTICE OF APPEARANCE**

12  CYTOSPORT, INC., A California Corporation
                                                       Date:        May 15, 2014
13                    Defendant,                       Time:        2:00 P.M.
                                                       Courtroom:   ??
14  ─────────────────────────────────────             Judge:       Hon. Claudia Wilken

15  William I. Chamberlain,

16                    Objector.

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................... II

INTRODUCTION (BY WAY OF A DIALOGUE) ................................................................................. 1

I.   I AM A MEMBER OF THE CLASS AND INTEND TO APPEAR AT THE FAIRNESS
     HEARING. .................................................................................................................................. 4

II.  THE COURT HAS A FIDUCIARY DUTY TO THE UNNAMED MEMBERS OF THIS
     CLASS. ....................................................................................................................................... 5

III. THE SETTLEMENT IS NOT FAIR, REASONABLE, OR ADEQUATE. .............................. 7

      A.    This settlement contains all three of the indicia of impermissible self-dealing
     identified by the Ninth Circuit in *Bluetooth*. ......................................................................... 7

      B.    The injunctive relief has no value to the class because it is prospective *and* duplicative
     of the FDA's efforts ................................................................................................................ 10

      C.    The in-kind *cy pres* has no value to the class and is better understood as an increase in
     CytoSport's marketing budget ................................................................................................. 12

      D.    The Incentive Award creates a conflict of interest for the named plaintiff and
     precludes certification of the class under Rule 23(a)(4). ....................................................... 15

      E.    The settlement accords preferential treatment to one-off purchasers of CytoSport's
     products. ................................................................................................................................... 17

IV.  THE COURT SHOULD NOT INFER SETTLEMENT APPROVAL IF THERE ARE ONLY
     A FEW OBJECTIONS. ............................................................................................................. 17

V.   THIS OBJECTION IS BROUGHT IN GOOD FAITH. .......................................................... 19

CONCLUSION ................................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373 (D. Kan. 1971) ...................................................................................................................................................23

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997)...............................................................5, 6

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) ................. 18, 20

*Cordy v. USS–Posco Indus.* No. 12-cv-00553-JST, 2013 WL 4028627 (N.D. Cal. Aug. 1, 2013)..........................20

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913 (7th Cir. 2011) ...........................19

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012).......................................................... passim

*Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401 (9th Cir. 1989) ........................................ 6

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) .................................... 22

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001)................................... 21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................................ 7

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013)................................................. 14

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ......................7, 8, 9, 19

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ............................................... passim

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ................... 22

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995).............................6, 8

*In re Mercury Interactive Corp.*, 618 F.3d 988 (9th Cir. 2010) ..................................................... 5

*In re Oracle Secs. Litig.*, 132 F.R.D. 538 (N.D. Cal. 1990) ....................................................... 11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)....................13

*In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166 D. Mass. 2005) ............................................. 5

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................................... 20

*In Re Wash. Pub. Power Supply Syst. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ..................................... 7

*Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996)....................................................................... 8

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ......................................................... 15, 17

*Lane v. Facebook, Inc.*, 709 F.3d 791 (9th Cir. 2013) ......................................................... 14, 17

*Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) ................................19

*Marek v. Lane*, 134 S. Ct. 8 (2013) ...............................................................................17

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987) ..................22

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ...............................................14

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..........................................................6, 14

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) .................................................18

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011)...............................................14, 15, 16

*Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI, 2012 WL 1380276 (N.D. Cal. Apr. 20, 2012) ................................................................................................................13

*Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (M.D. Pa. 1995) .............................22

*Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013) ..................................18, 19

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ...........................................5, 13

*Silber v. Mahon*, 957 F.2d 697 (9th Cir. 1992)....................................................................6

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ...............................15

*Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003) .....................................................passim

*Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844 (5th Cir. 1998) .........................................10

*Synfuel Techs., Inc., v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) ..........................12

*Tijero v. Aaron Bros., Inc.*, No. C 10–01089 SBA, 2013 WL 60464 (N.D. Cal. Jan. 2, 2013) ..............20

*True v. Am. Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) .........................................6, 12

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ...............................................7, 8

*Vought v. Bank of Am.*, 901 F. Supp. 2d 1071 (C.D. Ill. 2012)...............................................21

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) .........................................9

**Other Authorities**

Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009).........................23

Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000) ..........................11

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007) ...............................................................21

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal. F. 403 (2003) ........................................................................................23

Jason Feifer, *How Gatorade Redefined Its Audience And A Flagging Brand*, Fast Company, May 22, 2012, http://www.fastcocreate.com/1680819/how-gatorade-redefined-its-audience-and-a-flagging-brand. ...................................................................................................................................3

Lester Brickman, *Lawyer Barons* 522-25 (2011)..............................................................................11

Letter from Darlene Algomela, Director Compliance Branch, U.S. Food & Drug Administration to Michael Pickett, Chief Executive Officer and President, CytoSport, Inc. (June 29, 2011) *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm261684.htm. ........................2, 12

Michael Smith, *Muscle Milk Beefs Up College Presence*, SportsBusinessDaily, March 26, 2012 http://www.sportsbusinessdaily.com/Journal/Issues/2012/03/26/Marketing-and-Sponsorship/Muscle-Milk.aspx...........................................................................................3

Rick Barrett, *Drink Label Udderly Wrong; Maker of Muscle Milk Gets FDA Warning Letter*, Milwaukee Journal-Sentinel, July 31, 2011.....................................................................2, 12

Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529 (2004)...............................................22

**Rules**

Fed. R. Civ. Proc. 23(e)(5)..........................................................................................................4

**Treatises**

American Law Institute, *Principles of the Law of Aggregate Litig.* (2010)...............................................5, 12

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002).........................................5

Manual for Complex Litigation (2d ed. 1985)........................................................................17

# INTRODUCTION (BY WAY OF A DIALOGUE)

## Scene: A town hall meeting between class counsel and class members.

**Class Counsel:** Good news, folks!  We've agreed to a settlement with CytoSport, and the total value of the settlement is 5 million dollars![1]

**Smart-aleck class member:**  Excellent!  So we're getting $5 million in cash, then, distributed among us?

**Counsel:**  Well, not exactly.  That $5 million does include our fee, of about $1.2 million.  But that's only about 23% of the settlement value, and that's very standard for this sort of thing.[2]  After all, we did take this case on contingency.

**Class Member.**  I suppose that's fair. After all, you did all this work for us!  And if you are getting us $3.8 million dollars in cash, I suppose it's fair that you get $1.2 million.

**Counsel:**  Well, about that…you aren't getting $3.8 million in cash.

**Class Member:**  Come again?

**Counsel:**  You're getting $1 million in cash, distributed amongst everyone who files a claim.[3]

**Class Member:**  Um…so where'd the other $2.8 million go?

**Counsel:**  Well, one of the things we got in the settlement was an injunction that prevents CytoSport from marketing their product improperly in the future.  We both agreed that the injunction is worth $1 million, and that's part of the $5 million figure.[4]

**Class Member:**  Huh?  We're all sitting right here.  We were deceived in the past – we're not going to be deceived in the future, with or without this injunction. How does it help us going forward?

---

[1] *See* First Amended Settlement Agreement & Release ¶ 23 ("Settlement"), ECF No. 67-1 ("'Total Settlement Value' means the amount of $5,000,000 . . . .").

[2] *See, e.g., In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award . . . .").

[3] *See* Settlement ¶ 32 ("The Available Monetary Relief shall consist of the total sum of $1,000,000."); Settlement ¶ 32(c) ("If the total payments made to Settlement Class Members who completed a Claim Form exceeds the Available Monetary Relief, then the amount to be paid to each Settlement Class Member shall be reduced on a *pro rata* basis such that the aggregate value of all such claims equals the Available Monetary Relief.").

[4] *See* Settlement ¶ 31.

1    **Counsel**: Well, you know, maybe it doesn't help *you*, but there have to be a bunch of other people
2    out there who've never tried Muscle Milk.  This will help them – they won't be deceived about this for the
3    next three years!  All because of us!

4        **Class Member**: All because of you, eh?  So prior to this lawsuit, they were misrepresenting the
5    health benefits of their product, and it was *your* lawsuit that spurred them to change their labeling?

6        **Counsel**: Well, to be honest, no.  CytoSport had received an FDA warning letter in 2011,[5] and was
7    planning to change their labels prior to this settlement.[6]

8        **Class Member**: So what you're saying is that the FDA got CytoSport to stop labeling its products
9    improperly, and you got an injunction to prevent them from doing something they had already stopped
10   doing?

11       **Counsel**: Yeah!  We worked really hard on that.  It was a huge concession.

12       **Class Member**: What's your basis for saying that this was worth $1,000,000 again?

13       **Counsel**: Well, CytoSport agreed with us!  So it must be true.  After all, this was an arms-length
14   negotiation!

15       **Class Member**: What else makes up that $3.8 million figure?

16       **Counsel**: Well, it costs money to distribute checks and things like that.

17       **Class Member**: Sure, but not $3.8 million, right?

18       **Counsel**: No, we anticipate it will cost a few hundred thousand dollars.[7]  The rest is going to charity.

19       **Class Member**: Well, that's not ideal.  Given that we're the people who have been injured here, I
20   think we should be the ones deciding what to do with our money.  But I suppose I'm listening.  What
21   charity?

22       **Counsel**: Well, CytoSport has agreed to donate whatever is left over to charitable athletic events,

---

23
24       [5] Letter from Darlene Algomela, Director Compliance Branch, U.S. Food & Drug Administration to
     Michael Pickett, Chief Executive Officer and President, CytoSport, Inc. (June 29, 2011) [hereinafter Warning
25   Letter] *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm261684.htm.

26       [6] *See* Rick Barrett, *Drink Label Udderly Wrong; Maker of Muscle Milk Gets FDA Warning Letter*,
     Milwaukee Journal-Sentinel, July 31, 2011, http://www.jsonline.com/business/126489863.html ("[O]n its
27   website [CytoSport] says it is 'proactively and openly addressing the FDA's labeling concerns.'").

28       [7] *Cf.* Settlement ¶ 53.

1   like Susan G. Komen's Race for the Cure.[8]

2          **Class Member**. That's nice of them. Are they funding the costs of running the event?

3          **Counsel**: No, they are going to give out free Muscle Milk.[9]

4          **Class Member**: Isn't that the kind of thing they'd want to do anyway for publicity reasons? I'm

5   pretty sure Muscle Milk tries to give away its products to sports teams and at athletics events,[10] not just

6   because that's a good thing to do, but also because it's good for the brand profile. There's a reason we see

7   athletes drinking Gatorade, and I'm confident it's not because the athletes are paying for it out of their own

8   pocket.[11]

9          **Counsel**: Well, yeah, but it's still for a good cause.

10          **Class Member**: Wait a second, wasn't this whole case about false claims that Muscle Milk was

11   healthy?[12]

12          **Counsel**: Why does that matter?

13          **Class Member**: Well, if we were trying to punish Muscle Milk for deceiving consumers about the

14   health benefits of their product, it wouldn't be by making them give away their product at a "health" event

15   that would allow them to associate their product with being healthy.

16          **Counsel**: I guess I didn't really think of that.

17          **Class Member**. Sounds like you didn't think of a lot of things. Anyway, are you at least discounting

18

19

20   ─────────────

          [8] *See* Settlement ¶ 35.

21          [9] *See id.*

22          [10] *See, e.g.*, Michael Smith, *Muscle Milk Beefs Up College Presence*, SportsBusinessDaily, March 26, 2012

23   http://www.sportsbusinessdaily.com/Journal/Issues/2012/03/26/Marketing-and-Sponsorship/Muscle-
     Milk.aspx (quoting Muscle Milk's vice president of sports marketing as saying that "[i]f schools want us to be

24   a sponsor, but they don't want to use our product, that doesn't fit for us").

25          [11] *See* Jason Feifer, *How Gatorade Redefined Its Audience And A Flagging Brand*, Fast Company, May 22,

     2012,   http://www.fastcocreate.com/1680819/how-gatorade-redefined-its-audience-and-a-flagging-brand.

26   (quoting Gatorade's former global chief markting officer, Sarah Robb O'Hagan, as exclaiming: "Why on
     earth would you spend money on Super Bowl ads . . . when players are drinking our product the entire

27   game?").

28          [12] *See* Settlement at 1.

the value of the donated products? After all, CytoSport's cost per unit has to be pretty low,[13] and given that they are getting all these reputation benefits…

**Counsel**: No, the donations are valued at the retail value of the donated products.[14]

**Class Member**: So let's say, hypothetically, that we think your fee is too large, given that we don't agree that the injunctive relief or the "donations" are worth anything to us. What could we do about that?

**Counsel**: You could object. It's really difficult and annoying to do, and normally takes a person without anything interesting going on in their lives. If you do that, the court might decide to reduce our fee.

**Class member**: Great. I'm feeling a bit rambunctious at the moment, to be honest. If we get your fee reduced, does that mean we get more cash?

**Counsel**: No. The maximum the class can get under the agreement is $1,000,000: period. If our fee gets reduced, then CytoSport will donate more of its product to charitable athletic events.[15]

**Class Member**: See you in court.

## I.    I am a member of the class and intend to appear at the fairness hearing.

I am a United States resident. I purchased multiple Muscle Milk Ready-To-Drink products in the year 2009 at In-Shape Fitness Club: West Lane, located at 1074 E. Bianchi Rd, Stockton, CA 95210. I am therefore a member of the class with standing to object to the settlement. Fed. R. Civ. Proc. 23(e)(5).

My mailing address is 770 5th St NW APT 1013, Washington, DC 20001. My phone number is (209) 954-8042. My e-mail address is willchamberlain101@gmail.com. My Control Number is 2415013183. On January 28, 2014, I filed a claim; my claim number is 19522.

I hereby give notice of my intent to appear at the fairness hearing in this case, where I will appear *pro se* to discuss matters raised in this Objection. I do not intend to call any witnesses at the fairness hearing, but reserve the right to make use of all documents entered on to the docket by any settling party or objector. I reserve the right to cross-examine any witnesses who testify at the hearing in support of final approval or to

---

[13] *See Pumped Up: Muscle Milk*, BevNET Magazine, September 1, 2010 (quoting a beverage distributor as stating that "Muscle Milk offers one of the best penny and gross profits of any beverage on the market") *available at* http://www.bevnet.com/magazine/issue/2010/pumped-up-muscle-milk.

[14] *See* Settlement ¶ 35.

[15] *See* Settlement ¶¶ 33-35.

supplement this objection if the parties introduce new arguments for settlement approval or valuation after the objection deadline.  I join the objections of any other objectors or *amici* to the extent those objections are not inconsistent with this one.

## II.    The court has a fiduciary duty to the unnamed members of this class.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (internal quotation and citation omitted).  "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 192-94 (D. Mass. 2005) (*citing Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997)). *Accord Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("[D]istrict judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions.").

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable, and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("*GMC Pick-Up*") (internal quotation and citation omitted).  "A trial court has a continuing duty in a class action to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002).  "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members.").

There should be no presumption in favor of settlement approval; "[t]he burden of proving the fairness of the settlement is on the proponents." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013) ("*Pampers*") (citing 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010); American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*").

"[W]here the court is '[c]onfronted with a request for settlement-only class certification,' the court

must look to the factors 'designed to protect absentees.'" *Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir. 2003)

(quoting *Amchem,* 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a

higher standard of fairness." *Id.* "[P]re-certification settlement agreements require that [this Court] carefully

review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing

indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact

influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.,* 697 F.3d 858, 867 (9th Cir. 2012) (quoting

*Staton v. Boeing,* 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention when the

record suggests that the settlement is driven by fees; that is, when counsel receive a disproportionate

distribution of the settlement." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth*

*Headset Prods. Liab. Litig.,* 654 F.3d 935, 947 (9th Cir. 2011) ("*Bluetooth*"). Where the Court confronts a pre-

certification settlement, consideration of the eight *Hanlon* factors "alone is not enough to survive appellate

review" because "there is an even greater potential for a breach of fiduciary duty owed the class. . . ."

*Bluetooth,* 654 F.3d at 946. As such, this settlement "must withstand an even higher level of scrutiny for

evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *Id.* (citing

*Hanlon,* 150 F.3d at 1026).

It is insufficient that the settlement happened to be at "arm's length" without express collusion

between the settling parties; because of the danger of conflicts of interest, third parties must monitor the

reasonableness of the settlement as well. *Bluetooth,* 654 F.3d at 948 (quoting *Staton,* 327 F.3d at 960).

"Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at

the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the

district court must assume the role of fiduciary for the class plaintiffs. *Vizcaino v. Microsoft Corp.,* 290 F.3d

1043, 1052 (9th Cir. 2002) (quoting *In Re Wash. Pub. Power Supply Syst. Litig.*, 19 F.3d 1291 (9th Cir. 1994)). [16]

"Accordingly, fee applications must be closely scrutinized." *Vizcaino*, 290 F.3d at 1052.

## III. The Settlement is not fair, reasonable, or adequate.

### A. This settlement contains all three of the indicia of impermissible self-dealing identified by the Ninth Circuit in *Bluetooth*.

"Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant for . . . subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Bluetooth*, 654 F.3d at 947. In *Bluetooth*, the Ninth Circuit identified three indicia of such self-dealing: (1) "when counsel receive a disproportionate distribution of a settlement"; (2) "when the parties negotiate a 'clear' sailing' arrangement providing payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* All three of these warning signs are present in this settlement.

First, class counsel are set to receive a disproportionate distribution from this settlement. Class counsel request $1,187,500 in fees, Settlement ¶ 37, and the class is set to receive $1,000,000 in cash distributions, Settlement ¶ 32, meaning that class counsel would take home 54% of the constructive common fund, well above this circuit's 25% benchmark. *See, e.g., Dennis*, 697 F.3d at 867-68 (38.9% is a "clearly excessive" allotment of the "constructive common fund"); *Bluetooth*, 654 F.3d at 942 (describing the

---

[16] The parties may argue that the settlement did not create a common fund. This should make no difference. "That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award." *Staton*, 327 F.3d at 964. A "defendant is interested only in disposing of the total claim asserted against it." *Id.* "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *GMC Pick-Up*, 55 F.3d at 820-21. "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id.* at 821. *See also id. at* 820 (stating that a severable fee structure "is, for practical purposes, a constructive common fund"). "[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996). "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* § 21.71 (4th ed. 2008).

1    benchmark approach). The parties' *ipse dixit* that the total settlement value is $5,000,000, Settlement ¶ 23,

2    should not be persuasive; the non-monetary relief in the settlement has negligible value to class members.

3    *See infra* §§ III.B, III.C. *Bluetooth* factor one is met.

4        Second, class counsel have negotiated a clear-sailing agreement with the defendants. Settlement ¶ 37

5    ("CytoSport does not oppose, and will not encourage or assist a third party in opposing, Class Counsel's

6    request for attorneys' fees and costs totaling $1,187,500."). This "red-carpet treatment on fees" creates a

7    substantial incentive for class counsel to accept an unfair settlement on behalf of the class. *See Weinberger v.*

8    *Great N. Nekoosa Corp.*, 925 F.2d 518, 524-25 (1st Cir. 1991) ("[T]he very existence of a clear sailing provision

9    increases the likelihood that class counsel will have bargained away something of value to the class.");

10    *Bluetooth*, 654 F.3d at 947-48.

11        Third, the settlement includes what can only be described as a "quasi-kicker," a set of provisions

12    provisions that ensure that the defendant, and not the class, will benefit from any reduction of attorneys'

13    fees. Admittedly, this is not a classic "kicker" arrangement, where the parties expressly provide for fees not

14    awarded to simply revert to the defendant. But the defendant will still be the primary beneficiary of any

15    reduction in attorney's fees. First, the settlement ensures that "in no event" will the class receive more than

16    $1,000,000 in cash distributions from the settlement. Settlement ¶ 33. Rather, any decrease in fees will only

17    serve to increase the "Balance of the Total Settlement Value," a term defined in the settlement. Settlement ¶

18    35. The "Balance of the Total Settlement Value" will be distributed in the form of inventory distributions to

19    charitable athletic events. *Id.* Moreover, the value of the distributed products "shall be measured exclusively

20    according to the retail value of the products." *Id.*

21        This is an unorthodox settlement structure, but the effect is this: CytoSport will accrue the lion's

22    share of the benefit of any reduction in attorneys' fees. CytoSport is a private company and does not publish

23    its financials; however, the cost to CytoSport of producing Muscle Milk is probably very low. *See Pumped Up:*

24    *Muscle Milk*, BevNET Magazine, September 1, 2010 (quoting a beverage distributor as stating that "Muscle

25    Milk offers one of the best penny and gross profits of any beverage on the market") *available at*

26    http://www.bevnet.com/magazine/issue/2010/pumped-up-muscle-milk. Let's assume, for the moment,

27    that the retail value of a given CytoSport product is $5.00, and the cost to CytoSport to produce each unit is

28    $1.00 (probably a very conservative estimate.) Under the terms of this settlement, if the court were to reduce

1  the attorneys' fees by $500,000, CytoSport would save $500,000 in cash, and only have to distribute
2  inventory that cost it $100,000 to produce. That's a deal any CEO would take in a second – but it's not clear
3  how class members benefit. Moreover, because CytoSport will benefit from being associated with these
4  charitable athletic events, the real effect looks like this – if the court reduces fees by $500,000, CytoSport will
5  agree to increase its marketing budget by $100,000. *See Dennis*, 697 F.3d at 867-68 (expressing concerns about
6  "fictitious" valuations of *cy pres* relief that in "paper tiger" settlements). The function of these provisions is
7  almost identical to that of a standard "kicker" – as such, all three Bluetooth factors are present here.

8      This "quasi-kicker," in addition to being an indicator of unfairness under *Bluetooth*, also renders the
9  settlement substantively unfair. The "economic reality [is] that a settling defendant is concerned only with its
10  total liability." *Pampers*, 724 F.3d at 717 (quoting *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 859 (5th Cir.
11  1998)). This settlement demonstrates that CytoSport is willing to pay $2.2 million to make this case go away.
12  Even if this were a fair number, the kicker makes it impossible for this Court to give the class the relief *that*
13  *CytoSport is willing to pay*. It would be reversible error to approve a fee of $1.2 million out of a $2.2 million
14  constructive common fund: that would be "clearly excessive" under this Circuit's 25% benchmark. *Dennis*,
15  697 F.3d at 868. But, if the Court adjusts the fee, it cannot pass that money on to the class; all that will
16  happen is that a few more marathon runners will get free Muscle Milk. In effect, the parties have prevented
17  the Court from returning the fees and class relief to their natural equilibrium.

18      The "quasi-kicker" will also likely have the additional self-serving effect of protecting class counsel by
19  deterring scrutiny of the fee award. A court has less incentive to scrutinize a fee award, because the kicker
20  combined with the clear sailing agreement means that any reversion will only go to the defendant that had
21  already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809,
22  1839 (2000) (describing such a fee arrangement as "a strategic effort to insulate a fee award from attack");
23  Lester Brickman, *Lawyer Barons* 522-25 (2011) (arguing that reversionary kickers should be considered *per se*
24  unethical).

25      *Bluetooth* states that a district court faced with such questionable provisions can only approve a
26  settlement if it is "supported by a clear explanation of why the disproportionate fee is justified and does not
27  betray the class's interests." 654 F.3d at 949. That explanation has not been provided; the fee is not justified,
28  and the value of the settlement has been wildly inflated by the parties.

**B.    The injunctive relief has no value to the class because it is prospective *and* duplicative of the FDA's efforts**

As part of the settlement, Cytosport agreed to an injunction precluding it from using the phrases "Healthy, Sustained Energy," and "Healthy Fats" on its products, sugject to certain exceptions. *See* Settlement ¶¶ 27-30. The settlement agreement includes an *ipse dixit* that this injunctive relief is worth $1,000,000. *See* Settlement ¶ 31.

This disingenuous attempt to estimate the value of this injunction does nothing to serve the interests of the class and everything to serve the interest of class counsel. *See In re Oracle Secs. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990) (Walker, J.) (referring to injunctive relief "valued at some fictitious figure" coupled with "arrangements to pay plaintiffs' lawyers their fees" to be the "classic manifestation" of the class-action principal-agent problem). "Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." *Staton*, 327 F.3d at 974 (9th Cir. 2003).

Further, this valuation cannot stand as a matter of law because "'[t]he fairness of the settlement must be evaluated primarily based on how it *compensates class members'*- not on whether it provides relief to other people, much less on whether it interferes with defendant's marketing plans." *Pampers*, 724 F.3d at 720 (quoting *Synfuel Techs., Inc., v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)). Here, "[n]o changes to future advertising by [the defendant will benefit those who were already misled by [the defendant]'s representations." *True*, 749 F. Supp. 2d at 1077. Even if complying with the injunction would impose significant costs on CytoSport,[17] that is not the measure of compensable value. *Bluetooth*, 654 F.3d at 944 ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class.") (quoting *TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). Because this injunctive relief is *prospective*, it cannot remedy injuries done to the class in the past.

Moreover, this injunctive relief is particularly valueless to the class *because CytoSport was already planning to change its labeling*. The FDA sent CytoSport a warning letter demanding that they "correct the violations"

---

[17] It doesn't; CytoSport had already been planning to change its labels in response to the FDA Warning Letter, as discussed *infra*.

relating to these labeling issues back in June 2011.  *See* Warning Letter, *supra* note 5.  CytoSport stated on its website that it was "proactively and openly addressing the FDA's labeling concerns." *See* Rick Barrett, *Drink Label Udderly Wrong; Maker of Muscle Milk Gets FDA Warning Letter*, Milwaukee Journal-Sentinel, July 31, 2011, http://www.jsonline.com/business/126489863.html. This action was filed in July 2011, with the complaint containing essentially the same allegations that existed in the warning letter.[18]  The notion that it was class counsel, and not the FDA, that got CytoSport to change its labeling is risible.  Indeed, the injunction in the settlement is almost identical to the action demanded by the FDA.[19]

As such, even if class members might have benefited from the labeling change, that change was not the product of this settlement and class counsel cannot claim the injunction provides value to class members. *Reynolds*, 288 F.3d at 282 (it is "the *incremental* benefits" that matter, "not the total benefits") (emphasis in original). Class counsel's role must be more material than that of the rooster that takes credit for the sunrise. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir. 1998).  *See also Staton*, 327 F.3d at 961 (9th Cir. 2003) (expressing concern about "the incorporation in the agreement of promotion and complaint programs Boeing had already developed and implemented, with no obligation on the part of the Company to continue those programs in their present form or alternatively to substitute programs of the same efficacy."); *Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI, 2012 WL 1380276, at *2 (N.D. Cal. Apr. 20, 2012) ("[C]ounsel claim that the major benefit provided by the Settlement is the replacement of the HPFPs and the extended warranty. However, those benefits were provided voluntarily by BMW, separate and apart from the parties' Settlement . . . .").

---

[18] *Compare* Second Am. Compl. ¶¶ 69-71, ECF No. 35 *with* Warning Letter ¶ 3.

[19] *Compare* Warning Letter ("The label of your 'Chocolate Muscle Milk Nutrition Shake bears the claim 'Healthy, Sustained Energy' . . . . [T]his product does not meet the requirements for the use of the nutrient content claim healthy on food labeling . . . . Your 'Chocolate Muscle Milk Protein Nutrition Shake' product label . . . bear[s] the unauthorized nutrient content claim[] 'healthy fats' . . . . Your response should outline the specific actions you are taking to correct the violations cited above and prevent similar violations in the future.") *with* Settlement ¶ 27 ("No later than forty-five days following the Effective Date . . . (a) CytoSport will cease to use the words 'Healthy, Sustained Energy' . . . on any of the Products; and (b) CytoSport will cease to use the words 'Healthy Fats' on newly printed packaging of the RTD product . . . .").

**C.    The in-kind *cy pres* has no value to the class and is better understood as an increase in CytoSport's marketing budget**

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Imported to the class action context, it has become a increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members. *Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) (Smith, J., *dissenting from denial of rehearing en banc*). Still, non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See e.g., Dennis*, 697 F.3d at 868 (*cy pres* settlement can easily become "a paper tiger"); *Nachshin*, 663 F.3d at 1038 ("[A] growing number of scholars and courts have observed, the cy pres doctrine...poses many nascent dangers to the fairness of the distribution process") (citing authorities); *Molski*, 318 F.3d at 955 (holding *cy pres* to be an inadequate substitute for individual compensation); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Baby Products*") ("Cy pres distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); *ALI Principles* §3.07 cmt. b (2010) (rejecting position that "cy pres remedy is preferable to further distributions to class members").

This settlement contains two different *cy pres* elements. The first element disposes of leftover funds from the "Available Monetary Relief" of $1,000,000. If there is money left over, the settlement proposes that the money be paid to the American Heart Association. *See* Settlement ¶ 32(b)(i). While there are minor quibbles to be had with the selection of the AHA as a *cy pres* recipient,[20] this particular *cy pres* element is not that objectionable, primarily because the settlement proposes to double distributions to class members before giving any money to the AHA and the claims process is relatively straightforward. *See* Settlement § 32(b).

---

[20] The primary quibble would be that there is not a "driving nexus between the plaintiff class and the *cy pres* beneficiar[y]". *Nachshin*, 663 F.3d at 1038. While the AHA is a fine institution, the gravamen of this lawsuit is not that Muscle Milk is unhealthy, but that CytoSport misrepresented its health benefits. An appropriate *cy pres* recipient, therefore, is an organization "dedicated to protecting consumers from, or redressing injuries caused by, false advertising." *Dennis*, 697 F.3d at 867.

1    The second *cy pres* element, however, is far more insidious, and by itself should preclude approval of

2    this settlement. This is the in-kind *cy pres* distribution of Muscle Milk products to charitable athletic events

3    that is supposed to cover the "Balance of the Total Settlement Value." *See* Settlement ¶ 35. While not

4    explicitly identified as *cy pres*, this is not relief that is going to the class; it is a distribution of relief to third

5    parties. Moreover, it is this distribution that makes up the core of the parties' claim that the value of the

6    settlement is $5,000,000, as it is these distributions that will pay off the "balance." As the Ninth Circuit has

7    recognized, "the valuation of [in-kind *cy pres*] must be examined with great care to eliminate the possibility

8    that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar

9    number to the fund that is fictitious." *Dennis*, 697 F.3d at 868.

10   At the outset, this *cy pres* remedy should be rejected because the settlement demonstrates that it is, in

11   fact, practical to give out money to the class. *Cy pres* is supposed to be a second-best remedy, awarded only

12   when it is impracticable to distribute funds to the class. *See, e.g., Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th

13   Cir. 2012); *Nachshin*, 663 F.3d at 1036; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th

14   Cir. 1990). But here, the parties have already agreed to distribute $1,000,000 in cash among class members.

15   There is no coherent reason why distributing $1,000,000 would be practicable, but distributing double that

16   amount would be impracticable.

17   Even if it were acceptable to use *cy pres* to serve the purposes of deterrence, as opposed to

18   compensating class members, this distribution does no such thing. First, the cost to CytoSport of providing

19   these distributions is undoubtedly minimal, and nowhere close to the retail value of the products. *See* § III.A,

20   *supra; Dennis*, 697 F.3d at 867 (exploring same issue). But more importantly, these distributions can be

21   expected to provide a substantial *benefit* to CytoSport. If it is giving away its products at charitable athletic

22   events, it stands to benefit from the athletes themselves becoming aware of the product *and* from the

23   association with "health" that events like the Race for the Cure embody. *See* Introduction, *supra*.

24   Second, there is very little nexus between the *cy pres* recipient and the class as a whole; that's enough

25   to make approving the settlement reversible error. *Dennis*, 697 F.3d at 866 ("In approving the *cy pres*

26   distribution to charities that had no relation to the class or to the underlying claims, the distrit court 'applied

27   the incorrect legal standard' and abused its discretion."). One would suspect that very few class members are

28   going to run in the Race for the Cure, or any other charitable athletic event, where they might be so lucky as

to be nourished by some of CytoSport's products. Moreover, the Ninth Circuit has already explained that the appropriate *cy pres* recipients in false advertising class actions are organization "dedicated to protecting consumers from, or redressing injuries caused by, false advertising." *Id.* at 867. As wonderful as charitable athletic events might be, they do not have a nexus to *the legal claims* in this case, which have to do with false advertising,[21] not a mass tort for causing widespread health problems. "When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process man answer to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1039. *Accord Dennis*, 697 F.3d at 867. That is precisely what has happened here; the Court should not doubt that CytoSport is excited to work with "charitable athletic events." *See supra* n.11. The parties will undoubtedly cite *Lane* for the proposition that courts "do not require . . . that settling parties select a *cy pres* recipient that the court or class members would find ideal." 696 F.3d at 821. *Lane* does not save them;[22] the *cy pres* recipient in that case were designed to "promote the causes of online privacy and security" which were at the heart of plaintiff's claims. *Id.*

---

[21]   *See* Settlement § 1 ("WHEREAS, the Second Amended Complaint asserts claims for alleged violations of California's Consumers Legal Remedies Act, California's Unfair Competition Law, California's False Advertising Law, fraud, negligent misrepresentation, and unjust enrichment" (citations omitted)).

[22]   There is, concededly, some troubling dicta in *Lane* that is difficult to reconcile with the overwhelming weight of authority requiring scrutiny of class action settlements. *Compare Lane*, 696 F.3d at 821 ("Such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process . . . . [D]efendants can certainly be expected to structure a settlement in a way that does the least harm to their interests.") *with Dennis*, 697 F.3d at 867 ("Our standards of review governing pre-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of the negotiations.'"). The best way to read *Lane* is that it stands for two propositions: 1) that *cy pres* is acceptable when distributing funds to the class is impracticable, and 2) that the court should not force the parties to choose a "perfect" *cy pres* recipient. But to the extent that the parties might use *Lane* to say "don't inquire into our negotiations, just trust us, we're looking out for the class, really," they are fighting against the overwhelming weight of precedent, including *Dennis, Bluetooth, Staton, and Nachshin*, as well as the entire point of Rule 23(e). Note also that *Lane* hasn't exactly gotten approbation from other judges. *See, e.g., Lane*, 696 F.3d at 826 (Kleinfeld, J., dissenting); *Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) (Smith, J., dissenting from denial of rehearing en banc); *Marek v. Lane*, 134 S. Ct. 8 (2013) (Roberts, C.J., respecting the denial of certiorari).

It does appear that the parties have at least read *Dennis*, as the relevant settlement provision seems designed to be explicit about some aspects of the relief that were left ambiguous in that case.[23] However, clarifying these ambiguities does not insulate the parties from the force of *Dennis*. The Ninth Circuit held that the failure to clarify these ambiguities "detract[ed] from [its] ability to determine the true value of the constructive common fund." *Dennis*, 697 F.3d at 868. It follows that the parties' detail here makes it easier for the court to determine the value of the fund. What these disclosures do *not* do, however, is demonstrate that the settlement is fair. On the contrary, as discussed *supra*, the valuation of these distributions at retail value means not only that the distributions will not cost CytoSport very much, but also ensures that CytoSport will receive most of the benefit from any reduction in attorneys' fees.

**D.      The Incentive Award creates a conflict of interest for the named plaintiff and precludes certification of the class under Rule 23(a)(4).**

Apart from the fee award, the settlement assures the named plaintiff an unchallenged application for an incentive award of $5,000. Settlement ¶ 39. There is no "overlap" between the deal obtained by the named representatives and the unnamed class members. *Pampers*, 724 F.3d at 722. While the class members' shares can be reduced *pro rata*, Settlement ¶ 33, the named plaintiff's incentive award is fixed. This payment makes the named plaintiff far more than whole and "provide[s] a *disincentive* for the [named plaintiff] to care about the adequacy of relief afforded unnamed class members." *Pampers*, 724 F.3d at 722.

The Seventh Circuit referred to this phenomenon as "leverag[ing]" "the class device...for one person's benefit." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006). In *Murray*, the incentive payment "of $3,000...[was] three times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum." *Id.* "Such a settlement is untenable." *Id.*

---

[23] *Compare Dennis*, 697 F.3d at 867-68 ("[T]he settlement document gives no hint as to how [the in-kind *cy pres*] will be valued. Is it at Kellogg's cost? At wholesale value? At retail?" "Can Kellogg use the value of the distributions as tax deductions because they will go to charity?" "[W]ill the *cy pres* distributions be in addition to that which Kellogg has already obligated itself to donate, or can Kellogg use previously budgeted funds or surplus prodcuction to offset its settlement obligations?") *with* Settlement ¶ 35 ("The products to be distributed must have at least three months of valid use . . . . The value of any products distributed . . . shall be measured exclusively according to the retail value of such products . . . . The products distributed in this paragraph shall be in addition to any other charitable donations planned by CytoSport, and CytoSport shall not seek a tax deduction for such product donations.").

1    "The premise of a class action is litigation by representative parties adjudicates the rights of all class

2    members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class

3    members." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998). Just last year, the

4    Ninth Circuit again disavowed these types of disproportionate incentive awards. *See Radcliffe v. Experian Info.*

5    *Solutions*, 715 F.3d 1157 (9th Cir. 2013). The Ninth Circuit determined that incentive awards conditioned

6    upon endorsement of the settlement proposed were impermissible. But more than that, "the significant

7    disparity between the incentive awards and the payments to the rest of the class members further

8    exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* at 1165. "There is a

9    serious question whether class representatives could be expected to fairly evaluate whether awards ranging

10   from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards." *Id.* As the

11   disparity here is similar—$5,000 per representative, at most $60 per class member—the logic of *Radcliffe*

12   applies just as forcefully. In such situations there is a well-founded fear that named representatives will be

13   "more concerned with maximizing [their own gain] than with judging the adequacy of the settlement as it

14   applies to class members at large." *Id.* (quoting *Staton*, 327 F.3d at 977).[24]

15   Here, we have a settlement where the class representative will get $5,000, the attorneys will get $1.2

16   million, and will class members get at most $60, a worthless injunction, and worthless in-kind *cy pres*. The

17   main beneficiaries of this settlement are the attorneys; combined with the questionable clear-sailing and

18   "kicker" provisions of the settlement with the questionable relief, *Bluetooth, supra*, there is a tremendous

19   question of Rule 23(a)(4) adequacy: were the class representatives and counsel in this case acting in the best

20   interests of the class, or in the best interests of class counsel? *See Pampers, supra*. If the latter, then the

21   plaintiffs cannot satisfy the 23(a)(4) and (g)(4) adequacy inquiries. *See Lobatz v. U.S. West Cellular of Cal., Inc.*,

22   222 F.3d 1142, 1147 (9th Cir. 2000) (if "class counsel agreed to accept excessive fees and costs to the

23   detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class."); *Creative Montessori*

24   *Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (counsel must show the district court

25   that "they would prosecute the case in the interest of the class . . . rather than just in their interests as lawyers

26   who if successful will obtain a share of any judgment or settlement as compensation for their efforts."). The

27

28   [24] *Staton* had also repudiated disproportionate incentive awards.

class must be decertified if there is anything less than "undivided loyalties." *Broussard*, 155 F.3d at 338. At a minimum, the settlement must be rejected as unfairly dividing the constructive common fund.

**E.    The settlement accords preferential treatment to one-off purchasers of CytoSport's products.**

This Court cannot approve a class action settlement if it "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citing Manual for Complex Litigation, § 30.44 (2d ed. 1985)). The settlement offers, at most, $30.00 to every member of the class, regardless of how many Muscle Milk products they purchased. *See* Settlement ¶ 32(a).    To the extent that class members were injured by any false or misleading representations by CytoSport, the injury they would have suffered would vary depending on how regularly they purchased the product.    It stands to reason that if they purchased Muscle Milk once when they were hungry at an airport, they probably weren't as injured as if they were purchasing the product regularly to improve their health.    But, the settlement doesn't account for this and treats all class members identically. This should lead the court to deny approval to the settlement. *See, e.g., Tijero v. Aaron Bros., Inc.*, No. C 10–01089 SBA, 2013 WL 60464, at *10 (N.D. Cal. Jan. 2, 2013) (denying settlement approval in a wage and hour class action where the settlement did not differentiate between part-time and full-time employees, or between workers who received varying wages); *Cordy v. USS–Posco Indus.*, No. 12-cv-00553-JST, 2013 WL 4028627, at *4 (N.D. Cal. Aug. 1, 2013) ("The settlement agreement states that an employee will get the same credit for a week worked whether he or she worked a single shift that week or many shifts throughout the week.    It is not clear why this . . . is fair to all proposed class members.").

**IV.    The Court should not infer settlement approval if there are only a few objections.**

Any given class action settlement, no matter how much it betrays the interests of the class, will produce only a small percentage of objectors. The predominating response will always be apathy, because objectors—unless they can obtain *pro bono* counsel—must expend significant resources on an enterprise that will create little direct benefit for themselves. *See Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1093 (C.D. Ill. 2012) (citing, *inter alia*, a 1996 Federal Judicial Center survey that found between 42% and 64% of settlements engendered no filings by objectors).    Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this

understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing GMC Pick-Up*, 55 F.3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007).

Without *pro bono* counsel to look out for the interests of the class, and without the incentive of a fee award proportionate to success, filing an objection is economically irrational for the vast majority of individuals.[25] "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *GMC Pick-Up*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)); *accord Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . . '"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 680–681 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than affirmative support." *In re GMC Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

When class members have little at stake, the rate of response will be predictably low. As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See*

---

[25] I don't *think* I fall into this category; as a law student, I stand to gain a few unique benefits from objecting in this case. Although there really are some readings I should be doing…and they say that the irrational don't necessarily think they are irrational…

1   *GMC Pick-Up*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even

2   when low number of objectors in large class, when "those who did object did so quite vociferously");

3   Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical*

4   *and Empirical Issues*, 57 Vand. L. Rev. 1529, 1561 (2004) ("Common sense dictates that apathy, not decision, is

5   the basis for inaction."). It is typically not worth the average citizen's time or money to object: the slight

6   likelihood that one additional objection will be decisive, when multiplied by the slight increase in an

7   individual class member's payout that such an objection would produce, makes individually-funded

8   objections a losing proposition.

9         The Court must act as a guardian for *all* class members—whether or not they have formally entered

10   the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his

11   duty and, in fact, adds to h[er] responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores,*

12   *Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from

13   the number of objections. *GMC Pick-Up*, 55 F.3d at 812–13; *ALI Principles* § 3.05 cmt. a; *Vought*, 901 F. Supp.

14   2d at 1093.

15   **V.      This objection is brought in good faith.**

16         While it seems routine for parties in class action lawsuits to dismiss objectors as "professionals," that

17   is certainly not the case here.  A "professional objector" is a specific legal term referring to for-profit

18   attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a

19   share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in

20   good faith. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi.

21   Legal. F. 403, 437 n.150 (2003).  That's not me.  I'm not a lawyer (yet); I'm not going to ask for fees, and I

22   doubt that the law would permit me to get them even if I wanted to.  Moreover, I'm not going to engage in a

23   quid pro quo settlement and will not withdraw this objection in exchange for payment.  I am willing to

24   stipulate to an injunction prohibiting myself, and any attorneys I might retain, from accepting compensation

25   in exchange for the settlement of this objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62

26   Vand. L. Rev. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem).

27

28

**CONCLUSION**

This settlement is full of shenanigans, and cannot be approved in its current form. Disproportionate fees, a clear-sailing agreement, a quasi-kicker, a worthless and duplicative injunction, self-serving in-kind *cy pres*, a wildly disproportionate incentive award, and preferential treatment are all on display.  There's a pile of Ninth Circuit case law that precludes settlements like this one; this is not a close case.

Dated: March 5, 2014

Respectfully submitted,

*/s/ William I. Chamberlain*
William I. Chamberlain
770 5th St NW APT 1013
Washington, DC, 20001
*Pro se Objector*

1

2    PROOF OF SERVICE

3            I hereby certify that on this day I e-mailed this objection to the following:

4    Settlement Administrator
     *Delacruz v. CytoSport, Inc.*
5    c/o GCG
     P.O. Box 35069
6    Seattle, WA 98124-3508
     Telephone: 1.855.590.8658
7    Facsimile: 206.876.5201
     E-mail: administrator@CytoSportSettlement.com

8
     Counsel for the Class
9    Baron & Budd, P.C.
     Roland Tellis
10   Mark Pifko
     15910 Ventura Boulevard,
11   Suite 1600
     Encino, CA 91436
12   Telephone: 818.839.2333
     Facsimile: 818.986.9698
13   E-mail: mpifko@baronbudd.com

14   Counsel for CytoSport
     Gibson, Dunn & Crutcher LLP
15   G. Charles Nierlich
     Matthew L. Berde
16   Timothy W. Loose
     555 Mission St.,
17   Suite 3000
     San Francisco, CA 94105
18   Telephone: 415.393.8200
     Facsimile: 415.393.8306
19   E-mail: mberde@gibsondunn.com

20   DATED this 5th Day of March, 2014

21                                              */s/ William I. Chamberlain*

22                                              William I. Chamberlain

23

24

25

26

27

28