Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Attorneys for Plaintiff
CLAIRE DELACRUZ individually, and
on behalf of other members of the general
public similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAIRE DELACRUZ, individually, and on behalf of other members of the general public similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CYTOSPORT, INC., a California Corporation,<br><br>Defendant. | Case Number: 4:11-cv-03532-CW<br>**CLASS ACTION**<br><br>**PLAINTIFF'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: May 15, 2014<br>Time: 2:00 p.m.<br>Location: Courtroom 2, 4th Floor<br>1301 Clay Street<br>Judge: Hon. Claudia Wilken<br>Action Filed: July 18, 2011 |

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ................................................................................ 1

II.   THE CHAMBERLAIN/FRANK OBJECTIONS LACK MERIT ........................ 2

     A.    The Proposed Settlement Is Not the Subject of Self-Dealing ........................3

     B.    The Injunctive Relief Is Not Duplicative of the FDA's Efforts.....................7

     C.    The Objector's Concerns about any *Cy Pres* Component of the Settlement Are Misplaced ............................................................... 10

     D.    The Incentive Payment Does Not Create any Conflict of Interest or Otherwise Preclude Certification of a Settlement Class ............................... 13

     E.    The Settlement Does Not Accord Preferential Treatment to Any Class of Consumers .......................................................................... 16

III.  THE REMAINING TWO OBJECTIONS LACK MERIT ................................... 17

     A.    The Orrell Objection ............................................................... 17

     B.    The Smotzer Objection.............................................................. 18

IV.  CONCLUSION............................................................................ 22

# TABLE OF AUTHORITIES

CASE                                                                                          PAGE(S)

*Aguayo v. Oldenkamp Trucking*,
    2006 U.S. Dist. LEXIS 79425 (E.D. Cal. Oct. 17, 2006)..................................... 15

*In re Apple Inc. Sec. Litig.*,
    2011 WL 1877988 (N.D. Cal. May 17, 2011).................................................... 3

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ................................................................. *passim*

*Bruno v. Quten Research Institute, LLC et al.*,
    2013 U.S. Dist. LEXIS 35066 (C.D. Cal. March 13, 2013)................................. 8, 15

*In re Checking Account Overdraft Litig.*,
    830 F. Supp. 2d 1330 (S. D. Fla. 2011) ....................................................... 3

*Matter of Continental Illinois Securities Litig.*,
    962 F.2d 566 (7th Cir. 1992) ................................................................ 13

*Covillo v. Specialty's Café*,
    2014 U.S. Dist. LEXIS 29837 (N.D. Cal. Mar. 6, 2014) .................................. 14

*Cox v. Clarus Mktg. Group, LLC*,
    291 F.R.D. 473 (S.D. Cal. 2013) ............................................................ 14

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ...................................................... 10, 11, 13

*Dennis v. Kellogg Co.*,
    Case No. 09-CV-1786 (S.D. Cal. Nov. 14, 2013) ..................................... 2, 13

*Dewey v. Volkswagen of Am.*,
    2012 WL 6586511 (D.N.J. Dec. 14, 2012)....................................................... 2

*Faigman v. AT & T Mobility LLC*,
    2011 U.S. Dist. LEXIS 15825 (N.D. Cal. Feb. 16, 2011) .............................. 15

*Grant v. Capital Mgmt. Servs., L.P.*,
    2014 U.S. Dist. LEXIS 29836 (S.D. Cal. Mar. 5, 2014) ................................ 14

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .................................................... 1, 4, 17, 20

*Hartless v. Clorox Co.*,
    273 F.R.D. 630 (S.D. Cal. 2011) ................................................................. 8, 10, 15, 19

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ..................................................................................................... 6

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ....................................................................... 1, 11, 17

*Londaro v. Travelers Indem Co.*,
    706 F. Supp. 2d 766 (N.D. Ohio 2010) ............................................................. 2

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ........................................................................... 13, 15

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) .............................................................................. 10

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    842 F. Supp. 2d 346 (D. Me. 2012) ..................................................................... 2

*Paul, Johnson, Alston & Hunt v. Graulty*,
    886 F.2d 268 (9th Cir. 1989) ................................................................................. 4

*Radcliffe v. Experian Info. Solutions*,
    715 F.3d 1157 (9th Cir. 2013) .............................................................................. 14

*Rodrigues v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ........................................................................... 5, 13

*Rodriguez v. Disner*,
    688 F.3d 645 (9th Cir. 2012) .............................................................................. 14

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) .............................................................................. 12

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ....................................................................... 6, 8, 19

*Stevens v. Safeway, Inc.*,
    2008 U.S. Dist. LEXIS 17119 (C.D. Cal. Feb. 25, 2008) ........................... 15

*In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*,
    295 F.R.D. 438 (C.D. Cal. 2014) ..................................................................... 14

PLAINTIFF'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ................................................................................. 3, 21

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995) ............................................................................. 14

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ............................................................................... 4, 5, 6

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) .................................................................................. 18

*York v. Starbucks Corp.*,
    Case No. 08-07919 GAF, Dkt. No. 239, at *4 (C.D. Cal. Oct. 29, 2013) ..................... 15

**Other Authorities**

Rule 23 .......................................................................................................... 6, 17

PLAINTIFF'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT

# I.   INTRODUCTION

After almost three years of intensely contested litigation, Plaintiff Claire Delacruz ("Plaintiff") and Defendant CytoSport, Inc. ("CytoSport" or "Defendant") reached a settlement.  The settlement provides substantial benefits to consumers.  Indeed, to date, over 33,300 claims have been made, with only four objections.  Additionally, notice of the settlement has been disseminated to fifty-five federal and state government officials, and *none* of them filed objections.  In sum, the reaction of class members to the settlement has been overwhelmingly positive, and this is perhaps the most significant factor to be weighed when considering the adequacy of the proposed settlement.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness").

The proposed settlement was not achieved overnight or with ease.  On the contrary, it was achieved (i) after months of pre-filing investigation; (ii) after months of substantial and costly discovery, including depositions of three senior CytoSport executives, as well as third party discovery, which included depositions; (iii) after the exchange of four expert witness reports on the eve of a motion for class certification; and (iv) after three mediations, which were followed by weeks of continued settlement negotiations.  Nevertheless, like Monday-morning-quarterbacks, four objectors urge this Court to overlook the positive endorsement of over 33,300 claimants, the intensive work performed by class counsel, and sustain their meritless objections.  The objectors arguments are largely based on an incorrect reading of the settlement, inapposite case law, and the usual empty assertions of "self-dealing" and "collusion."

In the end, using a healthy dose of rhetoric, the objectors resort to nitpicking various components of the settlement in hopes of convincing this Court that the settlement is not "fair, reasonable and adequate."  Of course, however, this Court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components."  *Lane*

*v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012). And, because none of the four objections withstand scrutiny or otherwise render the settlement unfair, unreasonable and inadequate, they should be overruled in their entirety. Therefore, Plaintiff and class counsel respectfully request that the Court grant Plaintiff's pending Motion for Final Approval (Dkt. 81) and Plaintiff's Counsel's Motion for Attorneys' Fees and Costs (Dkt. 74).

## II. THE CHAMBERLAIN/FRANK OBJECTIONS LACK MERIT

Notorious serial objector Ted Frank, and his apparent law student protégé, William Chamberlain, filed virtually identical objections. Indeed, Mr. Frank "joins" in virtually all of Mr. Chamberlain's objections, and the two objections even share the same pleading format, and essentially identical argument headings and content.

Other District Courts in California have explained that:

> Many jurists and commentators bemoan that too much of the controversy in many class action litigations seem to center on the issue of attorneys' fees and that, as a result a cottage industry has developed of professional objectors, where again the emphasis or at least the primary motivation is attorneys' fees. As a corollary, when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of class members first.

*Dennis v. Kellogg Co.*, Case No. 09-CV-1786 (S.D. Cal. Nov. 14, 2013) (rejecting Objector Ted Frank's client's request for attorneys' fees) (internal citations and quotations omitted).

Mr. Frank is no stranger to this Court or other courts around the country. Indeed, many have labeled him as a professional objector who uses the objection process as a means to advance an ideological agenda. *See*, *e.g.*, *Londaro v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 773 (N.D. Ohio 2010) (describing Mr. Frank's arguments as "long on ideology and short on law."). Mr. Frank and his "Center for Class Action Fairness" have filed dozens of class action objections around the country and, while he urges the Court to believe that he is not a fee-seeking objector, the reality is that like other such objectors, he

too makes a living by extracting thousands of dollars from class action settlements. *See*, *e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 842 F. Supp. 2d 346, 351 (D. Me. 2012), *Dewey v. Volkswagen of Am.*, 2012 WL 6586511 (D.N.J. Dec. 14, 2012); *In re Apple Inc. Sec. Litig*., 2011 WL 1877988 (N.D. Cal. May 17, 2011). "[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1361 n. 30 (S. D. Fla. 2011).

In any event, regardless of their motivation, objectors bear the burden of proving any challenges to the reasonableness of a class action settlement. *See United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). Here, the objections raised by Chamberlain and Frank are meritless.

### A. The Proposed Settlement Is Not the Subject of Self-Dealing

Chamberlain/Frank erroneously and irresponsibly claim that the proposed settlement has the three "warning signs" of self-dealing identified by the Ninth Circuit in *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). An honest read of *Bluetooth*, however, reflects otherwise. In *Bluetooth*, the Ninth Circuit identified the following three "subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations":

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

> (2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal citations and quotations omitted). If such signs are present, a district court must examine the negotiation process to ensure the absence of collusion. *Id.* at 950.

But, here, there are no such "signs," subtle or otherwise, of collusion.  This case was hotly contested throughout every stage, including through motion practice, discovery, three mediations and months of settlement negotiations.  The settlement structure, in fact, reflects the adversarial nature of the parties' relationship.

First, unlike *Bluetooth*, under the settlement here, the class will receive a guaranteed monetary distribution of $1 million.  To date, over 33,300 class members have applied to receive more than $30.00 each.  No proof of purchase was necessary for class members to qualify for monetary relief, and class members were able to submit claim forms online, in addition to the use of other methods of delivery (including mail).

Second, unlike *Bluetooth*, class counsel here do not seek a "disproportionate distribution" of the settlement.  Contrary to the objectors' claims, class counsel requests an attorneys' fee award of $996,160.59 (after deducting class counsel's documented litigation expenses in the amount of $190,839.41).  This award, if granted, represents 24.9% of the of the $4,000,000 cash value of the Settlement Fund.[1]  The Ninth Circuit has established an attorney fee "benchmark" of 25% of the common fund.[2]  *Hanlon*, 150 F.3d  at 1029.  The Ninth Circuit also identified five factors which are relevant in determining whether requested attorneys' fees in a common fund case are reasonable:  (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) awards made in

---

[1] Although the Settlement Agreement values the settlement at $5,000,000, such sum includes valuing CytoSport's relabeling obligations at $1,000,000.  Class Counsel has submitted an expert report addressing the material nature of such relief.  (*See* Dkt. 67-3 and 68.)  To avoid any controversy regarding the value attributed to the injunctive relief, however, for purposes of calculating attorneys' fees based on a percentage of the common fund approach, Class Counsel deducted the $1 million value component and calculated the common fund value at $4,000,000.  But, if the Settlement Agreement is valued at $5,000,000, then Class Counsel's requested fee represents 19.9% of the settlement fund.

[2] This benchmark "can then be adjusted upward or downward to account for any unusual circumstances. . . .  Such an adjustment, however, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272-73 (9th Cir. 1989).

similar cases; and (5) the contingent nature of the fee and the financial burden carried by the plaintiffs. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). Accordingly, here, class counsel's request is consistent with the Ninth Circuit's 25% benchmark for measuring reasonable attorneys' fees under a percentage-of-the-fund approach. Moreover, the requested fees are also reasonable applying the *Vizcaino* factors.[3]

It is important to emphasize that, although the parties have agreed in the Settlement Agreement that the monetary value of CytoSport's relabeling is $1,000,000, for the purpose of calculating attorneys' fees based on the common fund approach, class counsel *did not* attribute any monetary value to such injunctive relief.

Third, it is true that CytoSport agreed not to object to class counsel's request for the attorneys' fees and expenses requested, subject to the Court's approval. But, the existence of a "clear sailing" provision does not, in and of itself, establish self-dealing. After all, Defendant CytoSport's counsel has an obvious interest in protecting its client who has a direct financial interest in the amount of the fees and expenses to be paid. *See Rodrigues v. W. Publ'g. Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) ("Objectors suggest that the 'clear sailing' provision by which [Defendants] agreed not to contest attorneys' fees or incentive awards of no more than $25,000 evinces collusion. However, both payments were to be made from the settlement fund, capped at $49 million. This scenario does not signal the

_____

[3]  The Ninth Circuit also has recognized the value of comparing the lodestar approach to the percentage of the fund approach. "Courts may compare the two methods of calculating attorney's fees in determining whether fees are reasonable." *Fischel*, 307 F.3d at 1007 (citation omitted). To assist the Court in evaluating the reasonableness of the time spent on this case, class counsel presented a schedule of their time records in connection with their pending motion for attorneys' fees. (*See* Dkt. 75, Declaration of Roland Tellis at Ex. 5.) As reflected therein, as of February 25, 2014, class counsel devoted a total of 1,453.35 hours prosecuting this litigation and negotiating its Settlement, resulting in a total lodestar of $855,157.25. Class counsel has incurred additional fees and expenses associated with the preparation of this response, the motion for final approval, and will incur additional fees and expenses attending a hearing on such motion.

possibility of collusion because, by agreeing to a sum certain, [Defendants] acted consistently with their own interests in minimizing liability.")

Moreover, the Ninth Circuit has a recognized that clear sailing provisions are not *per se* improper:

> [T]he parties may negotiate and agree to the value of a common fund (which will ordinarily include an amount represented an estimated hypothetical award of statutory fees) and provide that, subsequently, class counsel will apply to the court for an award from the fund, using common fund fee principles.

*Staton v. Boeing Co.*, 327 F.3d 938, 972 (9th Cir. 2003).

Indeed, Rule 23(h) provides that a district court may award reasonable attorneys' fees "that are authorized by law *or by the parties' agreement*." Fed. R. Civ. Proc. 23(h)(emphasis added). And, the Supreme Court has encouraged a consensual resolution of attorneys' fees *as the ideal toward which litigants should strive*. In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court explained that "[a] request for attorney's fees should not result in a second major litigation. *Ideally, of course, litigants will settle the amount of a fee*." *Id*. at 437 (emphasis added).

Instead, in *Bluetooth*, the Ninth Circuit held that, when confronted with a clear sailing provision, a district court should scrutinize the relationship between attorneys' fees and the benefits to the class, "being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* at 948. Here, of course, irrespective of whether CytoSport agreed not to object, the attorney's fees in this case were negotiated after extensive discussion and negotiation concerning of the size of the common fund, and the settlement agreement makes clear they are "subject to Court approval." (Dkt. 67-1, at ¶ 38.) Courts should evaluate the reasonableness of class counsel's fees in light of the Ninth's Circuit's "benchmark," and the following five factors: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) awards made in similar cases; and (5) the contingent nature of the fee and the financial burden carried by the plaintiffs. *Vizcaino*, 290 F.3d at 1048-50.

PLAINTIFF'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT

Finally, unlike *Bluetooth*, the objectors here candidly admit that the settlement does not include "a classic 'kicker' arrangement, where the parties expressly provide for fees not awarded to simply revert to the defendant." Nevertheless, determined to draw a parallel to the *Bluetooth* case, the objectors here claim that the proposed settlement has a "quasi-kicker" set of provisions which "ensure that the defendant, and not the class, will benefit from any reduction of attorneys' fees. The objectors are dead wrong. In *Bluetooth*, the Ninth Circuit described a "kicker" arrangement as an agreement to revert any unpaid attorneys' fees to the defendant rather than to the class. *Bluetooth*, 654 F.3d at 949. Here, if the Court does not award class counsel the attorneys' fees requested, then any unpaid sum *increases* the "Total Settlement Value" which, in turn, gets distributed in the form relabeled Muscle Milk light products, or other CytoSport products with a similar nutrient profile. (*See* Dkt 67-1, ¶ 35.) The Muscle Milk® Light product was not at issue in this litigation; it has a nutrient profile in line with the U.S. dietary guidelines. The intended beneficiaries of these products are expected to be class members, who will benefit from the nutrient profile of such products. (*See* expert report at Dkt. 67-2.)

## B.    The Injunctive Relief Is Not Duplicative of the FDA's Efforts

Given their purported "dedication" to class action fairness, Frank/Chamberlain's assault on the injunctive relief component of the settlement is hypocritical. The injunctive relief provided for by the settlement addresses the very heart of this case. In this case, Plaintiff's primary goal was to change the way that CytoSport marketed and advertised the subject products -- in particular, to enjoin CytoSport from marketing the subject products as "healthy." The settlement agreement undoubtedly achieved this goal by requiring CytoSport to cease using the words "Healthy, Sustained Energy" on the products' packaging, and to cease using the words "Healthy Fats" on the packaging for Muscle Milk RTD, unless: (1) the product actually contains less than 0.5 grams of saturated fat per serving, or (2) CytoSport includes the words "See nutrition information for saturated fat content" in connection with the phrase "healthy fats." (Dkt. No. 67-1.) Although it admittedly, is difficult to monetize such prospective injunctive relief, it is undeniable that

the changed labeling for the products benefits class members, who will no longer be misled by CytoSport's alleged misrepresentations.

As set forth in Dr. Carol Scott's declaration, a significant number of consumers of the Products have purchased them because of their perceptions that the Products are "healthy." (*See* Dkt. No. 67-3.) Dr. Scott's studies found that omitting the "healthy fats" and "Healthy, Sustained Energy" claims may affect as many as 35% to 50% of the consumers of the products, and that deletion of these phrases will encourage consumers to read the nutrition panels on the products' packaging. (*Id.*) Thus, the injunctive relief directly addresses the alleged misrepresentations at issue in this case, and provides that CytoSport correct such misrepresentations going forward.

In *Bruno v. Quten Research Institute, LLC et al.*, 2013 U.S. Dist. LEXIS 35066 (C.D. Cal. March 13, 2013), the district court approved a class action settlement which provided, among other things, for injunctive relief requiring the defendant to refrain from certain labeling practices. *Id.* at *4. In doing so, the district court noted:

> [I]n addition to monetary relief obtained by Class Counsel for class plaintiffs, there is a high value to the injunctive relief obtained in this case. New labeling practices affecting hundreds of thousands of bottles per year, over ten years, bring a benefit to class consumers, the marketplace, and competitors who do not mislabel their products.

*Id.* at *10. Such observations are equally applicable here.

The Frank/Chamberlain objectors also erroneously claim that the settlement agreement's "attempt to estimate the value of this injunction does nothing to serve the interests of the class and everything to serve the interests of class counsel." (Dkt. 79-2.) As a threshold matter, the objectors fail to recognize that, when determining the value of the settlement, the Ninth Circuit has directed courts to consider the *non-monetary benefits* conferred, as well as any cash attorneys' fee and cost payments to be made pursuant to the settlement terms with the defendants. *See*, *e.g.*, *Staton*, 327 F.3d at 972-74; *Hartless v. Clorox Co.*, 273 F.RD. 630, 645 (S.D. Cal. 2011), *aff'd.*, 473 F. App'x. 716 (9th Cir. 2012). California courts view the award to the class and the agreement on attorneys' fees a

package deal. *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 33 (2000). Thus, "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Consumer Privacy Cases*, 175 Cal. App. 4th 545, 554 (2009) (quoting the Ann. Manual for Complex Litigation § 21.71 at 525 (4th ed. 2008)).

Nevertheless, here, although the parties agreed that the monetary value of CytoSport's relabeling obligations is $1,000,000, for the purpose of calculating attorneys' fees based on the common fund approach, class counsel *did not* attribute monetary value to such injunctive relief. This form of relief does not easily lend itself to monetary valuation without the benefit of, and expense and time associated with, expert opinions. Furthermore, class counsel's requested fee award is within the Ninth Circuit's 25% "benchmark" *without* attributing any monetary value to the injunctive relief component.

Next, the Frank/Chamberlain objectors speculate that the "injunctive relief is particularly valueless because CytoSport was already planning to change its labeling." (Dkt. 79-2 at 10:25-26.) Again, however, the objectors conveniently avoid the evidence. In fact, in responding to the FDA's warning letter, CytoSport primarily addressed the FDA's concern about CytoSport's use of the word "milk" when the products contain no milk. (*See* Dkt. 27 at 14 -19.) With respect to the FDA's concern about the statement "Healthy, Sustained Energy" in connection with CytoSport's Chocolate Muscle Milk Protein Nutrition Shake, CytoSport took issue with the FDA's position and argued that CytoSport's use of the phrase "Healthy, Sustained Energy," in the context in which it appears, *does not* constitute a nutrient content claim. (*Id*. at 20-21.) Furthermore, CytoSport argued that "the statements 'healthy fats' and 'good carbohydrates' *are not express nutrient content claims because they are not direct statements about the level (or range) of fats or carbohydrates in the food*." (*Id*. at 22) (emphasis added). And, in the end, in response to the FDA's warning letter, CytoSport *did not* agree to remove or otherwise alter the statement "healthy fats."

In short, the Frank/Chamberlain objectors fail to recognize that even if CytoSport had responded to the FDA by involuntarily agreeing to make the labeling changes it agreed to here, an involuntary agreement does not have the force of law. By contrast, through the proposed settlement agreement, CytoSport has agreed to injunctive relief that *requires* it to make labeling changes and obligates the company to continue to maintain those changes.

## C. The Objector's Concerns about any *Cy Pres* Component of the Settlement Are Misplaced

The Frank/Chamberlain objectors contend that the "in-kind *cy pres* distribution" of certain Muscle Milk products is "insidious, and should by itself preclude approval of this settlement." (Dkt. 79-2 at 13.) To justify this vitriol, the objectors erroneously contend that "[w]hile not explicitly identified as *cy pres*, this is not relief that is going to the class; it is a distribution of relief to third parties." (*Id.*) The Frank/Chamberlain objectors are wrong. The distribution plan for these products ensures that reasonable efforts will be made to target class members. In that regard, the product distribution component of the settlement is not even properly considered *cy pres*.

In any event, to be clear, even if the product distribution is considered *cy pres*, it indisputably comports with the legal standard governing such distributions. Not uncommon in class action settlements, *cy pres* is a shortened phrase that refers to an ancient equitable doctrine "cy près comme possible," translated from the French to "as near as possible." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). Under this doctrine, in class action settlements, federal courts often authorize contributions, often charitable in nature, "'where the proof of individual claims would be burdensome or distribution of damages costly.'" *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) (*quoting Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990)). Such contributions are often made "in lieu of direct distribution of damages to silent class members, [and] allows[] for aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class." *Dennis*, 697 F.3d at 865 (internal quotation marks and citation omitted).

Case No.: 4:11-cv-03532-CW

PLAINTIFF'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT

Such contributions must "qualify as the next best distribution to giving the funds directly to class members." *Id.* (internal quotation marks and citation omitted). To so qualify, such contributions must "retain[] some connection to the plaintiff class and the underlying claims." *Id.*

Here, after the parties agreed to the establishment of a monetary fund totaling $1 million, they also negotiated the establishment of a fund called the "Balance of the Total Settlement Value" fund, from which product distributions will be made. The establishment of such a procedure does not diminish the cash payments made to the class. Nor are the product distributions to be made in lieu of cash payments to the class. Instead, the product distribution is simply one component of a multi-component settlement of complex litigation that the Court must consider as a whole. *Lane*, 696 F.3d at 818-19.

"The district court's review of a class-action settlement that calls for a *cy pres* remedy is not substantively different from that of any other class-action settlement except that the court should not find the settlement fair, adequate, and reasonable unless the *cy pres* remedy accounts for the nature of the plaintiffs lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.'" *Id*. at 819 (internal citations and quotations omitted). In that regard, the Ninth Circuit cautioned:

> We do not require as part of that [*cy pres*] doctrine that settling parties select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process. The statement in *Six Mexican Workers* and elsewhere in our case law that a *cy pres* remedy must be the "next best distribution" of settlement funds means only that a district court should not approve a *cy pres* distribution unless it bears a substantial nexus to the interest of the class members – that, as we stated in *Naschin*, the *cy pres* remedy 'must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.

*Id*. at 821 (rejecting numerous objections to *cy pres* component of settlement).

Here, the parties agreed that the "Balance of the Settlement Fund Value" fund will be distributed in the form of certain Muscle Milk Light products, or other products with a

similar nutrient profile, at places where class members can be found -- charitable athletic events focused on health-related topics, such as running events affiliated with cancer or heart disease prevention organizations, including the Susan G. Komen Race for the Cure -- according to a plan approved by the Court. The Muscle Milk Light product is not a product which was at issue in this litigation; it has a nutrient profile in line with the U.S. dietary guidelines. The targeted beneficiaries of these products are expected to be class members, and will benefit from the nutrient profile of such products. (*See* expert report at Dkt. 67-2.).

It bears emphasizing that, in this case, Plaintiff's primary goal here was to change the way that CytoSport marketed and advertised the products; in particular, to enjoin CytoSport from marketing the products as "healthy." Nevertheless, given the popularity of the products, it was equally important to educate consumers about the existence of other products which do provide a "healthy" nutritional profile. The distribution of the Muscle Milk Light product and other CytoSport products with a similar nutrient profile achieves this goal.

And, distributing such products at running events affiliated with cancer or heart disease prevention also achieves several other case-related goals: (1) it ensures greater consumer awareness about the importance of requiring companies like CytoSport to offer heart "healthy" products; (2) it commits CytoSport to continue to offer heart "healthy" products to the public; (3) it commits CytoSport's dollars to support heart "healthy" events; and (4) it reasonably ensures that CytoSport's product distributions will target class members who are expected to be at such events. Indeed, as reflected in the expert opinion of Dr. Carol Scott, over 60% of the surveyed Muscle Milk consumers drink the RTD product "when they are doing a fitness activity or workout." (Dkt. 68, ¶ 21.) And, a large percentage of the surveyed Muscle Milk consumers provided "health and fitness related responses" to justify their continued use of the products. (*Id.* at ¶ 25.)

In sum, even if the product distribution is considered *cy pres*, it meets the guiding standards in *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d at 1307-08, because it (1) addresses the objectives of the underlying statutes; (2) it targets the plaintiff class; and (3) it provides reasonable certainty that any member will be benefited.

Finally, the product distribution provisions of the proposed settlement address the other concerns raised by the Ninth Circuit in the *Dennis* case. In particular, the proposed settlement agreement provides that: (1) the value of any products distributed shall be measured according to their retail value; (2) the distribution shall occur over a three-year period; (3) the products distributed shall be in addition to any other charitable donations planned by CytoSport; and (4) CytoSport shall *not* seek a tax deduction for such product donation. (*See* Dkt. 67-1 at ¶ 35.) Such provisions indisputably address the "mysteries" of the *cy pres* provisions at issue in the *Dennis* case. 697 F.3d at 868.

### D. The Incentive Payment Does Not Create any Conflict of Interest or Otherwise Preclude Certification of a Settlement Class

Armed with largely inapposite case law, the Frank/Chamberlain objectors suggest that Plaintiff's incentive award creates some kind of "divided loyalty" with class members who will receive far less. The Frank/Chamberlain objectors' arguments in this regard reflect a naïve belief that class action settlements simply appear from thin air, without a lead plaintiff filing suit and working on behalf of the class. Indeed, it should come as no surprise to the objectors, that "[i]ncentive awards are fairly typical in class action cases. Such awards are discretionary and are intended to compensate class representatives for *work done on behalf of the class*." *Rodriguez v. West Publ'g. Corp.,* 563 F.3d 948, 958 (9th Cir. 2009) (citing 4 William B. Rubenstein et al., Newberg on Class Actions § 11:38 (4th ed. 2008)). These payments work both as an inducement to participate in the suit and as compensation for time spent in litigation activities. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (holding that the district court did not abuse its discretion in awarding an *incentive* award to the class representatives); *Matter of Continental Illinois Securities Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (stating that an

incentive award in such amount "as may be necessary to induce [the class representative] to participate in the suit" is appropriate).

So long as the incentive award does not create a conflict of interest between the representative and class members,[4] modest payments to named plaintiffs for their services as class representatives are customary and generally approved. *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995). To determine whether the proposed incentive award is fair and reasonable, many courts in the Ninth Circuit[5] "apply the five-factor test set forth in *Van Vranken* [*supra*]." *Grant v. Capital Mgmt. Servs., L.P.*, 2014 U.S. Dist. LEXIS 29836 (S.D. Cal. Mar. 5, 2014).

Under the *Van Vranken* test, courts will look at several factors, including: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken*, 901 F. Supp. at 299 (citations omitted). Not all factors need to present, as the Court may weigh the factors, and award fees that are "just and reasonable

---

[4] The facts here do not create or exacerbate actual or potential conflicts between the class representatives and the class -- the primary ground for denying incentive awards. *See Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013) (finding that an agreement conditioning incentive payment on approving the class action settlement created a conflict between the class and the Plaintiff in denying the incentive award and settlement); *Rodriguez v. Disner*, 688 F.3d 645, 651 (9th Cir. 2012) (finding an agreement conditioning incentive payment requests to the amount recovered by the class to be improper). Here, there is no agreement of any kind that ties Plaintiff's request for incentive payments to any condition. As such there is simply no evidence of any actual or potential conflict between Plaintiff and the class.

[5] *See, e.g., In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 469-72 (C.D. Cal. 2014) (applying the *Van Vranken* test and awarding $5,000 to three class representatives.); *Cox v. Clarus Mktg. Group, LLC*, 291 F.R.D. 473, 483 (S.D. Cal. 2013) (same); *Covillo v. Specialty's Café*, No. C-11-00594 DMR, 2014 U.S. Dist. LEXIS 29837 (N.D. Cal. Mar. 6, 2014) (awarding $8,000 to three plaintiffs in a three-year class action after applying the *Van Vranken* test).

1  under the circumstances." *In re Toys "R" Us FACTA Litig.*, 295 F.R.D. at 472 (citing *Van*
2  *Vranken*, 901 F. Supp. at 299).
3      A modest incentive payment of $5,000 to Plaintiff Clare Delacruz is fair and
4  reasonable given her invaluable contributions to this action.  Ms. Delacruz has submitted a
5  declaration in connection with her motion for final approval with describes the
6  considerable time and effort she spent in advancing in the interests of the Class over the
7  past three years.  (*See* Dkt. 81-1.)  *See also*, *Bruno*, 2013 U.S. Dist. LEXIS 35066
8  (approving $8,000 incentive payment because "a class representative is entitled to some
9  compensation for the expense he or she incurred on behalf of the class lest individuals find
10  insufficient inducement to lend their names and services to the class action.")
11      This modest award is also consistent with amounts that district courts in California
12  typically award as incentive payments.  The Northern District of California, for instance,
13  has held that, in that district, a $5,000 incentive payment to a class representative is
14  "presumptively reasonable."  *Faigman v. AT & T Mobility LLC*, 2011 U.S. Dist. LEXIS
15  15825, *5 (N.D. Cal. Feb. 16, 2011).  Other courts have also used $5,000 as a benchmark
16  for incentive awards.  *See, e.g., In re Mego Financial Corp*., 213 F.3d at 463 (approving a
17  $5,000 incentive award for each class representative); *Aguayo v. Oldenkamp Trucking*,
18  2006 U.S. Dist. LEXIS 79425, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a
19  settlement agreement, which provided that class counsel would apply for an incentive
20  award of no more than $5,000 for the named plaintiff).
21      Finally, courts routinely award named plaintiffs different amounts in accordance
22  with each plaintiff's contributions.  *See Hartless v. Clorox Co*., 273 F.R.D. 630, 646-47
23  (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for
24  another who participated for a shorter time); *see also York v. Starbucks Corp*., No. 08-
25  07919 GAF, Dkt. 239, at *4 (C.D. Cal. Oct. 29, 2013) (approving incentive payments of
26  $10,000 to one plaintiff and $2,000 to a plaintiff that first participated during the settlement
27
28

process); *Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119, **34-37 (C.D. Cal. Feb. 25, 2008) ($20,000 and $10,000 to two class representatives).

The amount of the requested incentive aware was arrived at through negotiations with CytoSport, and finalized after the terms of class relief. It thus, reflects a realistic assessment by both sides of the effort expended by Plaintiff and the amount likely to be awarded had the parties not reached an agreement. Plaintiff committed herself to working with class counsel in litigating the case and in bringing it to a successful conclusion. This commitment of personal time to support a case in which Plaintiff had a modest personal interest, but which has provided benefits to tens of thousands of absent class members, warrants the Court's approval of the requested incentive awards.

### E. The Settlement Does Not Accord Preferential Treatment to Any Class of Consumers

Reflective of their true motivations here, the Frank/Chamberlain objectors curiously rely on wage and hour class settlements -- which improperly credited the employee class for time worked whether such employee worked a single shift or multiple shifts -- to argue that the proposed settlement here offers the same sum of money to every class member, regardless of how many Muscle Milk products they purchased. Therefore, the Frank/Chamberlain objectors surmise that class members who may have purchased "Muscle Milk once when they were hungry at an airport" "probably weren't as injured as if they were purchasing the product regularly to improve their health." (Dkt. 79-2 at 17.)

But, the Frank/Chamberlain objectors fail to recognize that, unlike a wage and hour case, where employee time records are maintained, the exact number of purchases of Muscle Milk products by each class member cannot easily be determined from available data. Thus, the parties arrived at the $30 minimum cash payment because Plaintiff's expert witness surveys of Muscle Milk consumers evidenced that they purchased and consumed Muscle Milk products on a "frequent" basis. Such survey results are even confirmed by the fact that objector Chamberlain claims to have purchased "multiple" Muscle Milk products in 2009, and objector Frank claims to have purchased "more than twelve" bottles

of the Muscle Milk RTD. Given that the average retail price of the various Muscle Milk RTD products is approximately $3.50, the parties' settlement provides class members with a *full recovery* for at least 8 product purchases. There was simply no preferential treatment given to any class group.

Ultimately, the amount of monetary recovery available to class members was the subject of compromise. As the Ninth Circuit cautioned, "settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. Moreover, "the question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court. Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, the district court's only role in reviewing the substance of the settlement is to ensure that it is "fair, adequate, and free from collusion." *Lane*, 696 F.3d at 819.

## III. THE REMAINING TWO OBJECTIONS LACK MERIT

### A. The Orrell Objection

Mr. Orrell contends that he "do[es] not believe that the claims stated are inaccurate" because he "experienced excellent results in maintaining sustained energy through the day without any negative side effects." In so arguing, Mr. Orrell fails to understand the nature of the case. This case did not challenge whether the Muscle Milk products maintained "sustained energy" or whether they provided energy without "negative side effects." Rather, Plaintiff alleges that CytoSport's use of the word "healthy" to advertise the subject products is false and misleading, because they contain significant amounts of fats, sugars, and other unhealthy ingredients. (*See* Dkt. 35.) Plaintiff further alleges that CytoSport's use of the term "healthy" in its advertising for the subject products is misleading because this practice is in direct violation of FDA regulations defining the term "healthy" in food labeling.

In this regard, Plaintiff proffered the expert opinion of Dr. Lisa Young, Ph.D., a nutrition professor at New York University, and nutritionist in private practice, who examined the ingredients included in the subject products and determined their nutritional quality based on current nutrition guidelines and recommendations for healthy eating. In connection with class certification, Dr. Young prepared a report which concludes, in sum, that the subject products are not healthy or nutritious.

Next Mr. Orrell objects on the basis that "the maximum $60 damage award to any single Class Member is inconsequential and obviously not worth any individual's time, effort or expense to bring forth such a ridiculous suit." But, ironically, Mr. Orrell's sentiments are precisely why a class action case is the *only* suitable mechanism to provide relief to class members. The alternative to class certification in this case would be either tens of thousands of separate small claims cases, or the abandonment of claims by most class members because the amount of individual recovery would be modest. As such, a class action is clearly the superior vehicle for addressing these claims. *See Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1175-76 (9th Cir. 2010).

Nevertheless, Mr. Orrell's speculation about whether the monetary relief available to class members is "worth any individual's time," is wrong, and demonstrably so. To date, over 33,300 class members disagree with Orrell's views.

### B. The Smotzer Objection

Finally, Mr. Smotzer, through counsel, objected to the settlement on various grounds, none of which have merit.

First, Smotzer first claims erroneously that Class Counsel has requested a fee of $1,187,500 despite the fact that "few people will go through the trouble of submitting a claim for an amount so small, as parties are well aware." To date, however, the Claims Administrator has received over 33,300 entitling consumers to receive all of the $1 million set aside for cash payments.

Second, Mr. Smotzer claims that the injunctive relief, the administrative expenses, providing notice to the class, the *cy pres* award and the product donation "should not be

counted as part of the settlement fund or settlement benefit to class members." This objection mirrors one made by Frank/Chamberlain and has been addressed above. Mr. Smotzer fails to recognize that, when determining the value of the settlement, the Ninth Circuit has directed courts to consider the *non-monetary benefits* conferred, as well as any cash, attorneys' fees and cost payments to be made pursuant to the settlement terms with the defendants. *See, e.g. Staton*, 327 F.3d at 972-74; *Hartless v. Clorox Co.*, 273 F.RD. at 645. California courts view the award to the class and the agreement on attorneys' fees a package deal. *Lealao*, 82 Cal. App. 4th at 33. Thus, "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Consumer Privacy Cases*, 175 Cal. App. 4th at 554 (quoting the Ann. Manual for Complex Litigation § 21.71 at 525 (4th ed. 2008)). Moreover, the Ninth Circuit has unequivocally held that "post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class." *Staton*, *supra*, 327 F.3d at 975.

Third, Mr. Smotzer erroneously claims that class counsel's fee would amount to 108% of the total settlement value because he speculates that only $100,000 in claims will be made. Had Mr. Smotzer bothered to read the settlement he would have learned that the settlement commits $1 million in guaranteed monetary payments to class members. Indeed, over 33,330 claims have been made ensuring that all of that sum will be paid to class members.

Fourth, Mr. Smotzer erroneously relies on case law concerning the use of "vouchers" to argue that class counsel's attorneys' fees cannot be determined until the Court values the "benefits actually claimed by class members." Again, had Mr. Smotzer bothered to read the settlement agreement he would have learned that there are no "vouchers" being issued here. Rather, CytoSport is making monetary payments to the over 33,300 claimants, making monetary payments for administrative and notice costs, making

monetary payments for the incentive award and attorneys' fees and must distribute product pursuant to a plan approved by the Court.

Fifth, Mr. Smotzer curiously argues that, in valuing a settlement, the Court should look at the actual claims rate. Plaintiff agrees. To date, over 33,300 claims have been made, with only four objections. Additionally, notice of the settlement has been disseminated to fifty-five federal and state government officials, and *none* of them filed objections. The reaction of class members to the settlement has been overwhelmingly positive, and is perhaps the most significant factor to be weighted in considering its adequacy. *See Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness").

Sixth, Mr. Smotzer argues that the distribution of the relabeled Muscle Milk Light product is "nothing more than a marketing incentive program for Cytosport." Mr. Smotzer is wrong. As noted above, Plaintiff's primary goal here was to change the way that CytoSport marketed and advertised the products -- in particular, to enjoin CytoSport from marketing the products as "healthy." Nevertheless, given the popularity of the products, it was equally important to educate consumers about the existence of *other* CytoSport products which do provide a "healthy" nutritional profile. The distribution of the Muscle Milk Light product and other CytoSport products with a similar nutrient profile achieves this goal.

And, distributing such products at running events affiliated with cancer or heart disease prevention also achieves several other case-related goals: (1) it ensures greater consumer awareness about the importance of requiring companies like CytoSport to offer heart "healthy" products; (2) it commits CytoSport to continue to offer heart "healthy" products to the public; (3) it commits CytoSport's dollars to support heart "healthy" events; and (4) it reasonably ensures that CytoSport's product distributions will target class members who are expected to be at such events. Indeed, as reflected in the expert opinion

of Dr. Carol Scott, over 60% of the surveyed Muscle Milk consumers drink the RTD product "when they are doing a fitness activity or workout." (Dkt. 68, ¶ 21.) And, a large percentage of the surveyed Muscle Milk consumers provided "health and fitness related responses" to justify their continued use of the products. ( *Id.* at ¶ 25.)

Seventh, Mr. Smotzer speculates that "[g]iven the abuse class members have already suffered at the hands of CytoSport, they certainly will be reluctant to engage in further use of CytoSport products." Of course, Smotzer bears the burden of proving his assertion. *See United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). In that regard, Mr. Smotzer provides no evidence for his idle speculation. In any event, if Mr. Smotzer harbors any doubt about the popularity of CytoSport's products and the loyalty of its customer base, even in view of the settlement of this case, Mr. Smotzer need only review the Orrell objection in which he expressed his strong defense of CytoSport. If anything, Mr. Smotzer highlights the importance of the injunctive relief component here. CytoSport's loyal consumers will no longer be misled by CytoSport's alleged misrepresentations.

Finally, Mr. Smotzer muses that "Cytosport's agreement to pay unreasonable attorneys' fees to class counsel calls into question the fairness of the settlement." As noted above, class counsel's fees are not simply paid pursuant to a purported "agreement." Rather, they must be approved by the Court. In that regard, the reasonableness of class counsel's fees will be determined by this Court, not by CytoSport. Class Counsel's concurrently filed motion for attorneys' fees and costs provides the Court will all of the information necessary to find that class counsels' fees are indisputably reasonable. Mr. Smotzer's empty assertions lend nothing to the reasonableness inquiry.

/ / /

/ / /

/ / /

## IV. CONCLUSION

For all of the foregoing reasons, the four objections to the proposed settlement are not well-taken and should be overruled in their entirety. Accordingly, Plaintiff and class counsel respectfully request that the Court grant Plaintiff's pending Motion for Final Approval (Dkt. 81) and Plaintiff's Counsel's Motion for Attorneys' Fees and Costs (Dkt. 74).

Respectfully submitted,

Dated: April 11, 2014

BARON & BUDD, P.C.

By: /s/ Roland Tellis
     Roland Tellis

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Attorneys for Plaintiff
CLAIRE DELACRUZ, individually, and
on behalf of other members of the public
similarly situated