PAGES 1 – 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CLAIRE DELACRUZ,               )
INDIVIDUALLY, AND ON BEHALF )
OF HERSELF AND ALL OTHERS    )
SIMILARLY SITUATED,            )
                               )
        PLAINTIFF,           )   NO. C-11-3532 CW
                               )
 VS.                           )   THURSDAY, MAY 15, 2014
                               )
CYTOSPORT, INC.,              )   OAKLAND, CALIFORNIA
                               )
        DEFENDANT.           )   MOTION FOR SETTLEMENT
_____)        FAIRNESS HEARING

**BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**            BARON & BUDD, P.C.
                             15910 VENUTRA BOULEVARD, SUITE 1600
                             ENCINO, CALIFORNIA 91436
                     BY:  MARK PIFKO, ESQUIRE
                          DANIEL ALBERSTONE, ESQUIRE


**FOR DEFENDANT:**           GIBSON, DUNN & CRUTCHER
                             555 MISSION STREET, SUITE 3000
                             SAN FRANCISCO, CALIFORNIA 94105
                     BY:  G. CHARLES NIERLICH, ESQUIRE, ESQUIRE
                          MATTHEW L. BERDE, ESQUIRE, ESQUIRE


**ALSO PRESENT:**            WILLIAM I. CHAMBERLAIN, OBJECTOR


**REPORTED BY:**             DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                             OFFICIAL COURT REPORTER

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1   THURSDAY, MAY 15, 2014                              2:13 P.M.

 2                   P R O C E E D I N G S

 3        THE CLERK:  WE ARE CALLING C-11-3532 DELACRUZ VERSUS

 4   CYTOSPORT, INC.

 5      PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE

 6   RECORD, PLEASE.

 7        MR. PIFKO:  GOOD AFTERNOON, YOUR HONOR.  MARK PIFKO

 8   FROM BARON & BUDD ON BEHALF OF PLAINTIFFS.

 9        THE COURT:  WOULD STAND OVER BY THE JURY BOX, PLEASE.

10        MR. ALBERSTONE:  GOOD MORNING, YOUR HONOR -- GOOD

11   AFTERNOON.  DAN ALBERSTONE OF BARON & BUDD ALSO FOR THE

12   PLAINTIFFS.

13        MR. NIERLICH:  GOOD AFTERNOON, YOUR HONOR.  CHARLES

14   NIERLICH WITH MY COLLEAGUE MATT BERDE FOR THE DEFENDANT

15   CYTOSPORT.

16        MR. CHAMBERLAIN:  GOOD MORNING (SIC), YOUR HONOR.

17   WILL CHAMBERLAIN.  I'M A PRO SE OBJECTOR.

18        THE COURT:  OKAY.  AND ARE THESE ALL THE PEOPLE WHO

19   ARE HERE ON THIS CASE?  WE DON'T HAVE ANY OTHER OBJECTORS

20   PRESENT?

21        MR. NIERLICH:  TO OUR KNOWLEDGE, YES.

22        THE COURT:  ANYBODY ELSE HERE WANT TO OBJECT TO THE

23   SETTLEMENT?

24                    (NO RESPONSE.)

25        THE COURT:  OKAY.  SO I DO HAVE A COUPLE OF QUESTIONS
```

1    AND THEN I WILL HEAR BRIEFLY FROM EACH SIDE, THEN I'LL HEAR

2    FROM THE OBJECTOR IF HE FEELS THAT HIS ISSUES HAVEN'T BEEN

3    ADDRESSED, AND THEN WE'LL TAKE IT FROM THERE.

4        I HAVE A QUESTION ABOUT THE DIFFERENCE BETWEEN A COST

5    NUMBER THAT YOU HAD BEFORE AND THE COST NUMBER THAT YOU HAVE

6    NOW, AND I'M WONDERING WHY THAT HAS CHANGED.  AND LET ME SEE

7    IF I CAN FIND THE NUMBERS.

8            **MR. PIFKO:**  YOUR HONOR, MAYBE I CAN PREEMPTIVELY

9    EXPLAIN THE ANSWER TO YOUR QUESTION.

10       I BELIEVE THAT BECAUSE WE WENT BACK AND CHANGED THE TERMS,

11   WE RESTRUCTURED THE WAY ATTORNEYS' FEES AND COSTS WERE SET UP.

12   ORIGINALLY THERE WAS SORT OF A NOT-TO-OBJECT COST NUMBER --

13           **THE COURT:**  A SORT OF A WHAT?

14           **MR. PIFKO:**  NOT-TO-OBJECT COST NUMBER.

15           **THE COURT:**  I DON'T KNOW WHAT THAT MEANS.

16           **MR. PIFKO:**  THEY SET A CAP ON THE COSTS REGARDLESS OF

17   WHAT WAS ACTUALLY INCURRED.  AND WHEN WE WENT BACK AND

18   RENEGOTIATED IT, THEY JUST SAID WE COULD SUBMIT ALL OF OUR

19   ACTUAL COSTS.  SO THAT'S WHY THERE'S A DIFFERENT NUMBER.

20           **THE COURT:**  SO BEFORE IT WAS EIGHTY-SEVEN FIVE.

21           **MR. PIFKO:**  THAT WAS JUST A CAP, THOUGH.  THAT WASN'T

22   OUR ACTUAL COST.  IT WAS A CAP THAT THEY HAD PUT ON IT.  THE

23   ONE NINETY -- I DON'T HAVE IT -- IS OUR --

24           **THE COURT:**  THEN YOU HAD THE ONE NINETY EIGHT

25   THIRTY-NINE FORTY-ONE.

1          **MR. PIFKO:**  RIGHT.

2          **THE COURT:**  $190,839.41.

3          **MR. PIFKO:**  THAT'S OUR ACTUAL COST THAT WE INCURRED.

4          **THE COURT:**  CURRENT ACTUAL COSTS.

5          **MR. PIFKO:**  RIGHT.

6          **THE COURT:**  AND THE EIGHTY-SEVEN FIVE WASN'T RELATED

7     TO YOUR COSTS AT ALL, IT WAS SIMPLY A CAP ON COSTS, AND YOU

8     MIGHT HAVE HAD LESS OR MORE COSTS THAN THAT AT THAT TIME?

9          **MR. PIFKO:**  RIGHT.  THAT WAS THE WAY THE SETTLEMENT

10    WAS STRUCTURED THAT THEY PUT A CAP IT.

11         **THE COURT:**  DO YOU AGREE WITH THAT?  IS THAT WHAT

12    HAPPENED?

13         **MR. NIERLICH:**  YOUR HONOR, I BELIEVE, AND I'LL TAKE A

14    LOOK AT THIS RIGHT NOW --

15         **THE COURT:**  I'M JUST CONCERNED WHETHER YOU WERE

16    INSTEAD RECHARACTERIZING SOMETHING THAT YOU USED TO CALL

17    SOMETHING ELSE AND NOW RECHARACTERIZED IT AS COST.  THAT WAS

18    MY CONCERN.

19         **MR. PIFKO:**  IT WAS JUST -- IT'S SIMPLY THAT.

20         **THE COURT:**  THAT'S NOT WHAT HAPPENED?

21         **MR. PIFKO:**  THE COST DIDN'T CHANGE.  WE DIDN'T

22    RECHARACTERIZE ANYTHING.  WE JUST SET IT UP SO THAT THERE WAS

23    NO CAP, AND UNDER THE PREVIOUS AGREEMENT THERE WAS.

24         **MR. NIERLICH:**  YOUR HONOR, IF I MAY, JUST TO CLARIFY.

25     THERE WAS AN ORIGINAL SETTLEMENT AGREEMENT.  AND THEN YOU

1    MAY RECALL, AFTER THE PRELIMINARY HEARING, WE HAD AN AMENDED

2    SETTLEMENT AGREEMENT.

3          **THE COURT:** RIGHT.

4          **MR. NIERLICH:** THE ORIGINAL SETTLEMENT AGREEMENT HAD

5    THE $87,500 CAP FOR COSTS AND A DIFFERENT ATTORNEYS' FEES

6    FIGURE THAT WAS ACTUALLY HIGHER. AND IN THE RE-NEGOTIATED

7    AGREEMENT, THE PLAINTIFFS AGREED TO A LOWER NUMBER, WHICH IS

8    THE -- ULTIMATELY BE ONE ONE EIGHT SEVEN FIVE HUNDRED, BUT IT

9    WAS ATTORNEYS' FEES AND COSTS TOGETHER.

10        AND THAT'S IN THE AMENDED AGREEMENT, DOCKET 67-1,

11   PARAGRAPH 38.

12         **THE COURT:** THIS IS SOUNDING DIFFERENT TO ME. WHAT

13   DID YOU JUST SAY? NOW THERE'S A NUMBER FOR ATTORNEYS' FEES

14   AND COSTS TOGETHER?

15         **MR. NIERLICH:** NO. WHAT I'M SAYING IS, IN THE

16   AMENDED SETTLEMENT AGREEMENT, THE OPERATIVE SETTLEMENT

17   AGREEMENT, THE ONE THAT WAS SUBJECT TO THE NOTICE AND WAS

18   PRELIMINARILY APPROVED BY THE COURT, THE AGREEMENT IS NOT TO

19   OBJECT UP TO A CLAIM FOR $1,187,500 IN ATTORNEYS' FEES AND

20   COSTS. SO ATTORNEYS' FEES AND COSTS WERE TREATED TOGETHER,

21   WHEREAS IN THE ORIGINAL SETTLEMENT, THERE WAS A FIGURE FOR

22   ATTORNEYS' FEES AND A SEPARATE FIGURE FOR COSTS. DOES THAT

23   HELP?

24         **THE COURT:** YES, BUT SO NOW THE FIGURE THAT'S BEING

25   SOUGHT FOR ATTORNEYS' FEES IS HOW MUCH?

1          **MR. PIFKO:**  THE ACTUAL NUMBER FOR FEES WHEN YOU

2     SUBTRACT COSTS IS NINE NINE SIX SIX SIX ZERO AND FIFTY-NINE

3     CENTS.

4          **THE COURT:**  OKAY.  AND THE COST NUMBER IS THE --

5          **MR. PIFKO:**  ONE NINETY EIGHT THREE NINE AND FORTY-ONE

6     CENTS.

7          **THE COURT:**  AND THOSE TWO NUMBERS ADDED UP TOGETHER

8     EQUALS?

9          **MR. PIFKO:**  ONE EIGHTY-SEVEN -- ONE ONE EIGHT SEVEN

10    FIVE HUNDRED.

11         **THE COURT:**  SO TO THE EXTENT THE FIRST SETTLEMENT

12    AGREEMENT ALLUDED TO EIGHTY-SEVEN FIVE IN COSTS, DO YOU AGREE

13    WITH WHAT HE SAID THAT THAT WASN'T RELATED TO THEIR ACTUAL

14    COSTS THAT THEY WERE CLAIMING, BUT WAS RATHER A CAP ON COSTS

15    SEPARATELY?

16         **MR. NIERLICH:**  THAT WAS A CAP ON COSTS THAT WE

17    UNDERSTOOD TO BE LESS THAN THE TOTAL AMOUNT OF COSTS THAT THEY

18    WERE CLAIMING AT THAT TIME, BUT WE DID NOT SEPARATELY

19    INVESTIGATE THE TOTAL AMOUNT OF COSTS THEY WERE CLAIMING AT

20    THAT TIME.

21         **THE COURT:**  OKAY.  SO YOU HAVE -- DO YOU HAVE ANY

22    REASON TO BELIEVE THAT WHAT'S HAPPENED IS THAT THEY'RE

23    RECHARACTERIZING AS COSTS SOMETHING THAT HAD PREVIOUSLY BEEN

24    CHARACTERIZED AS SOMETHING ELSE?

25         **MR. NIERLICH:**  I HAVE NO REASON TO BELIEVE THAT TO BE

THE CASE, YOUR HONOR.  AGAIN, WE HAD AN ORIGINAL AGREEMENT

THAT PROVIDED FOR ONE NUMBER FOR FEES AND ANOTHER FOR COSTS

AND AN AMENDED AGREEMENT THAT HAD FEES PLUS COSTS TOGETHER.

**THE COURT:**  OKAY.

**MR. PIFKO:**  JUST SO YOU KNOW, TOO, THAT THE DELTA

BETWEEN THE ORIGINAL AGREEMENT AND THE AMENDED AGREEMENT WAS

ABOUT $140,000 THAT WE TOOK OFF FROM FEES.

**THE COURT:**  OKAY.

SO, YOU HAVE A NUMBER IN THE SETTLEMENT AGREEMENT OF

1,807,500 IN PRODUCT DONATIONS AND SETTLEMENT ADMINISTRATION

COSTS, I THINK.

AND MY QUESTION IS, WHAT'S THE BREAKDOWN THERE?  HOW MUCH

OF THAT IS, IN FACT, SETTLEMENT ADMINISTRATION AND HOW MUCH

ARE YOU ATTRIBUTING TO THE COST OF PRODUCT DONATIONS?

**MR. PIFKO:**  I HAVEN'T SEEN THE BILL FOR THE

SETTLEMENT ADMINISTRATION YET.  AND I UNDERSTAND THAT A FINAL

BILL HASN'T BEEN MADE BECAUSE WHEN THEY ACTUALLY MAIL OUT THE

CHECKS AND PRINT THE CHECKS AND EVERYTHING, THERE'S GOING TO

BE SUBSTANTIAL COSTS IN CONNECTION WITH THAT.

I -- MY INFORMATION IS REALLY WHAT I KNOW FROM THEM, SO I

THINK MR. NIERLICH CAN SPEAK TO THAT.

**MR. NIERLICH:**  YOUR HONOR, I WILL BE HAPPY TO ADDRESS

THAT.  THE SETTLEMENT COSTS INCURRED TO DATE ARE APPROXIMATELY

$220,000.

**THE COURT:**  SETTLEMENT ADMINISTRATION COSTS?

1           **MR. NIERLICH:**  SETTLEMENT ADMINISTRATION AND NOTICE

2      COSTS, CORRECT.  AND THEN ON TOP OF THAT, WE WOULD ANTICIPATE

3      THERE BEING A SUBSTANTIAL ADDITIONAL PORTION ASSOCIATED WITH

4      SENDING OUT THE CHECKS TO THE 30,000 PLUS CLAIMANTS AND ALSO

5      JUST BE OTHER ISSUES THAT GO INTO ADMINISTERING A SETTLEMENT

6      OF THAT SIZE.

7          SO MY BEST GUESS ESTIMATE WOULD BE A LITTLE BIT NORTH OF

8      $300,000.

9              **THE COURT:**  MORE OR ALTOGETHER?

10             **MR. NIERLICH:**  TOTAL.  THAT WOULD BE AN ESTIMATE,

11     YES.

12             **THE COURT:**  WHICH LEAVES US ABOUT A MILLION AND A

13     HALF FOR PRODUCT DISTRIBUTION.

14             **MR. NIERLICH:**  ASSUMING THAT ESTIMATE IS CORRECT,

15     YES.

16             **THE COURT:**  AND DESCRIBE TO ME HOW THE PRODUCT

17     DISTRIBUTION WILL WORK.

18             **MR. NIERLICH:**  SURE.

19         THE PRODUCT DISTRIBUTION, THERE'S A PLAN THAT WE INCLUDED

20     WITH CYTOSPORT RESPONSE TO THE FINAL APPROVAL MOTION WOULD BE

21     CONSISTENT WITH THE REQUIREMENTS OF THE SETTLEMENT AGREEMENT;

22     NAMELY, THAT A PRODUCT WOULD BE DISTRIBUTED, AND IT WOULD

23     BE -- FIRST OF ALL, THE PRODUCT TO BE DISTRIBUTED WOULD BE NOT

24     THE PRODUCT THAT WAS ORIGINALLY AT ISSUE HERE, MUSCLE MILK,

25     BUT MUSCLE MILK LIGHT --

1      **THE COURT:**  RIGHT.

2      **MR. NIERLICH:**  -- OR A COMPARABLE PRODUCT LIKE THAT

3    WITH A LOWER AMOUNT OF FAT AND FEWER CALORIES THAN THE

4    ORIGINAL MUSCLE MILK --

5      **THE COURT:**  RIGHT.  I AM MORE PICTURING WHAT, YOU SET

6    UP A TABLE AT A RACE AND HAND OUT BARS TO PEOPLE?

7      **MR. NIERLICH:**  IT DEPENDS ON THE RACE.  IT DEPENDS ON

8    THE EVENT.  SO THE EVENTS TARGETED ARE CHARITABLE ATHLETIC

9    EVENTS WITH A HEALTH-RELATED TOPIC.  SO, FOR EXAMPLE, THE

10   SUSAN B. KOMEN RACE FOR THE CURE, OR SOMETHING LIKE THAT.

11     OBVIOUSLY DEPENDS WHAT EVENTS ARE BEING OFFERED IN THE

12   TIME FRAME IN WHICH THIS TAKES PLACE WHICH, OF COURSE, WE

13   DON'T KNOW UNTIL WE SEE WHETHER THERE MIGHT BE AN APPEAL OF

14   ANY DECISION, AND SO ON, BUT THOSE -- IT DEPENDS ON THE RACE

15   RULES EXACTLY HOW THAT WOULD HAPPEN.

16     SO IT COULD BE DISTRIBUTED FROM A TABLE, IT COULD BE

17   PROVIDED TO PARTICIPANTS IN SOME OTHER WAY.  IT JUST DEPENDS

18   ON THE EVENT --

19     **THE COURT:**  YOU'RE TALKING ABOUT A LOT OF BARS.  SO

20   THIS IS GOING TO BE SORT OF A MAJOR THING.  YOU'RE GOING TO

21   HAVE TO FIND RACES IN VARIOUS PLACES AND APPLY TO BE ONE OF

22   THE TABLES THAT GOES THERE, AND SEND THE BARS AND SEND THE

23   PEOPLE.  THIS ISN'T JUST GOING TO HAPPEN.

24     **MR. NIERLICH:**  THAT'S CORRECT, YOUR HONOR.  IT IS A

25   MAJOR UNDERTAKING.  IT WILL TAKE PLACE OVER A COURSE OF THREE

1    YEARS.

2        THERE WOULD BE, AS WE INDICATED IN THE PRODUCT

3    DISTRIBUTION PLAN SUBMITTED TO THE COURT, WE'D BE REPORTING TO

4    THE COURT WHAT IS INTENDED TO BE DONE AND THEN AFTERWARDS

5    WHAT, IN FACT, HAS BEEN DONE, AND IT WOULD BE, YOU KNOW,

6    FAIRLY BROAD EFFORT WITH QUITE A FEW PRODUCT.

7        IF YOU ASSUME FOR THE MOMENT ONE AND A HALF MILLION

8    DOLLARS AND IF YOU ASSUME A RETAIL VALUE OF, YOU KNOW, FOUR TO

9    $5 PER CONTAINER OF PRODUCT, YOU'RE TALKING ABOUT MORE THAN

10   300,000 UNITS.  THIS IS NOT A SMALL EFFORT.

11           **THE COURT:**  RIGHT.  THAT'S MY POINT.  SO THIS WOULD

12   BE NATIONWIDE OR WHERE WOULD THESE EVENTS BE TAKING PLACE?

13           **MR. NIERLICH:**  IT WOULD BE -- DEPENDS ON WHERE THE

14   EVENTS ARE OFFERED.  CERTAINLY WOULD NOT BE INTENDED TO BE --

15           **THE COURT:**  EVENTS ARE OFFERED EVERYWHERE.

16           **MR. NIERLICH:**  RIGHT.  AND WITH WHOM WE WOULD BE ABLE

17   TO MAKE SURE WE MADE THE PROPER ARRANGEMENTS TO DO THIS AS

18   EFFECTIVELY AS POSSIBLE.

19        BUT THAT WOULD BE -- I HATE TO SAY "NATIONWIDE" BECAUSE I

20   DON'T WANT TO IMPLY NECESSARILY EACH OF THE 50 STATES, BUT IT

21   WOULDN'T BE JUST IN CALIFORNIA.

22           **THE COURT:**  THIS IS A NATIONWIDE CLASS, IS IT NOT?

23           **MR. NIERLICH:**  YES.

24           **THE COURT:**  OKAY.  SO YOU WOULD BE MAKING AN EFFORT,

25   AT LEAST, TO BE BROADLY GEOGRAPHICALLY DIVERSE?

1        **MR. NIERLICH:**  ABSOLUTELY.

2        **THE COURT:**  AND THIS WOULD GO TO PEOPLE WHO WERE LIKE

3   RUNNING IN A RACE FOR CHARITY TYPE THING?

4        **MR. NIERLICH:**  THAT'S CORRECT.

5        **THE COURT:**  THE ACTUAL RUNNERS.  AND THEY'D GET IT

6   WHEN THEY FINISHED, OR WHEN THEY STARTED, OR SOMETIME OR

7   OTHER?

8        **MR. NIERLICH:**  IT WOULD DEPEND ON THE EVENT RULES.

9   IT MIGHT BE PROVIDED ONLY TO PARTICIPANTS.  IT MIGHT ALSO BE

10  PROVIDED TO PEOPLE WHO SIMPLY COME TO WATCH.  AGAIN, DEPENDS

11  ON WHAT THAT RACE ALLOWS YOU TO DO AND HOW IT'S STRUCTURED,

12  WHICH IS REALLY A RACE-BY-RACE ISSUE -- OR EVENT BY EVENT, I

13  SHOULD SAY.

14       **THE COURT:**  SO YOU'LL HAVE SOMEBODY ON YOUR STAFF WHO

15  LOOKS AROUND AND FINDS APPROPRIATE EVENTS AND CONTACTS

16  ORGANIZERS AND OFFERS YOUR PRODUCT AND KEEPS TRACK OF HOW MUCH

17  IS GIVEN, AND SETS UP THE TABLE AND HIRES THE PERSON TO GO TO

18  THE TABLE; YOU ARE GOING TO DO ALL THAT?

19       **MR. NIERLICH:**  CORRECT INSOFAR AS DETERMINING THE

20  EVENT.  WHETHER OR NOT THERE'S A PHYSICAL TABLE WOULD, AGAIN,

21  DEPEND ON THE EVENT RULES.  THE EVENT ORGANIZERS, IN SOME

22  CASES, WOULD ALLOW YOU TO HAVE A TABLE AND DISTRIBUTE

23  DIRECTLY, AND OTHER CASES MIGHT PREFER TO HAVE YOU DELIVER THE

24  PRODUCT AND THEY WOULD DISTRIBUTE IT.  IT JUST DEPENDS ON THE

25  EVENT.

1      **THE COURT:** I SEE. BUT THE DOLLAR AMOUNT IS GOING TO

2  BE THE RETAIL COST OF THE PRODUCT, NOT --

3      **MR. NIERLICH:** CORRECT.

4      **THE COURT:** -- NOT YOUR COST IN FINDING EVENTS, AND

5  SHIPPING THINGS, AND SETTING UP TABLES, AND ALL THAT?

6      **MR. NIERLICH:** CORRECT. ACCORDING TO THE SETTLEMENT

7  AGREEMENT, IT IS VALUED AS THE RETAIL VALUE OF THE PRODUCT

8  DISTRIBUTED. THE BENEFIT THAT IS ACTUALLY TAKEN DIRECTLY BY

9  THE MEMBERS OF THE CLASS. CORRECT.

10      **THE COURT:** SO THE OTHER ADMINISTRATIVE-TYPE EXPENSES

11  OR ORGANIZING EXPENSES WILL BEING BORNE BY YOU, I TAKE IT?

12      **MR. NIERLICH:** THAT'S CORRECT, YOUR HONOR.

13      **THE COURT:** SO WHAT CAN YOU TELL ME, I'M SURE I'VE

14  READ THIS A MILLION TIMES, BUT WHAT CAN YOU TELL ME ABOUT THE

15  STATUS OF THE LAW WITH RESPECT TO DETERMINING ATTORNEYS' FEES

16  BY WAY OF PERCENTAGE OF THE COMMON FUND VERSUS LODESTAR?

17      WE KNOW WE'RE SUPPOSED TO CROSS-CHECK. WE KNOW THAT OFTEN

18  IT'S PERCENTAGE, CROSS-CHECK WITH LODESTAR, BUT WHAT IS THE

19  STATE OF THE LAW WITH RESPECT TO, FOR EXAMPLE, AWARDING FEES

20  BASED ON LODESTAR CROSS-CHECKED AGAINST PERCENTAGE PERHAPS?

21      I DON'T KNOW WHO WANTS TO ANSWER THAT.

22      **MR. PIFKO:** I'M NOT SURE I FULLY UNDERSTAND YOUR

23  QUESTION --

24      **THE COURT:** THERE'S TWO POSSIBLE WAYS TO DETERMINE

25  ATTORNEYS' FEES ONE COULD THEORETICALLY USE. ONE IS

1    PERCENTAGE OF A COMMON FUND AND ONE IS LODESTAR.  AND CASES

2    TALK ABOUT THAT.  AND I THINK THEY GENERALLY SAY THAT THE

3    LODESTAR IS PREFERRED, I'M THINKING, BUT THEY ALWAYS SAY THAT

4    ONE SHOULD CHECK THE PERCENTAGE AGAINST THE LODESTAR.

5        BUT MY QUESTION IS, IS THERE ANY LAW THAT SAYS YOU CAN'T

6    USE THE LODESTAR INSTEAD?  DO YOU HAVE TO USE A PERCENTAGE OF

7    COMMON FUND?

8            **MR. PIFKO:**  NO, YOUR HONOR.  I BELIEVE IT'S AT YOUR

9    DISCRETION AS TO WHICH APPROACH YOU WOULD LIKE TO USE.  AND AS

10   I BELIEVE YOU WOULD KNOW IN OUR ATTORNEYS' FEE MOTION, WE

11   PROVIDED AN ANALYSIS UNDER BOTH METHODS.

12           **THE COURT:**  RIGHT.  WHAT'S YOUR OPINION?

13           **MR. NIERLICH:**  YOUR HONOR, WE DIDN'T OBJECT TO THE

14   ATTORNEYS' FEES REQUEST.  AND SO I DON'T --

15           **THE COURT:**  I'M JUST ASKING YOU ABOUT THE LAW, WITH

16   RESPECT TO WHETHER IT'S LEGALLY CORRECT TO USE LODESTAR

17   INSTEAD OF PERCENTAGE OF THE COMMON FUND JUST AS A

18   HYPOTHETICAL QUESTION.

19           **MR. NIERLICH:**  SURE, YOUR HONOR.

20       ADDRESSING IT IN THAT FRAMEWORK, I'M AWARE OF THE CASE LAW

21   THAT LOOKS AT BOTH OF THOSE ISSUES INDEPENDENTLY.  I BELIEVE

22   IT CAN BE DONE EITHER WAY, AS MR. PIFKO SAYS, AT THE COURT'S

23   DISCRETION.

24           **THE COURT:**  OKAY.  CAN YOU THINK OF ANY WAY THAT ONE

25   COULD VALUE THE INJUNCTION APART FROM YOUR AGREEMENT?  IS THAT

1  THE SORT OF THING SOME EXPERT COULD OPINE UPON?  IS THERE SOME

2  ANALYTICAL METHOD BY WHICH ONE COULD CALCULATE SUCH A THING?

3       **MR. PIFKO:**  WELL, YOUR HONOR, YOU KNOW, WE SORT OF

4  DOWNPLAY THE INJUNCTION A LITTLE BIT IN OUR PAPERS --

5       **THE COURT:**  I KNOW --

6       **MR. PIFKO:**  -- BECAUSE OF THE DIFFICULTY OF

7  EVALUATING IT, BUT I WANTED YOU TO KNOW WE DO THINK IT'S A

8  SUBSTANTIAL BENEFIT.

9     I'M SURE, MANY CASES YOU CAN IMAGINE, JUST ACHIEVING AN

10  INJUNCTION IN A CASE IS A SIGNIFICANT ACCOMPLISHMENT, AND WE

11  FEEL THAT IT'S AN IMPORTANT OUTCOME IN THIS CASE.

12     AS FAR AS YOUR SPECIFIC QUESTION, WE DID SUBMIT IN THE

13  AMENDED SETTLEMENT PAPERS THAT AFTER -- WE HAD SUBMITTED TO

14  YOU AFTER PRELIMINARY APPROVAL, WE DID SUBMIT A DECLARATION

15  FROM A MARKETING EXPERT WHERE SHE -- YOU KNOW, IT'S REALLY

16  HARD TO PUT A SPECIFIC PRECISE NUMBER ON IT, BUT SHE NOTED

17  THAT -- SHE'S A U.C.L.A. MARKETING PROFESSOR.  AND SHE NOTED

18  THAT BASED ON SURVEYS THAT SHE HAD DONE WITH CLASS

19  CERTIFICATION REPORT IN THIS CASE, THAT 35 TO 50 PERCENT OF

20  THE CLASS MEMBERS WERE -- WOULD HAVE FOUND THE REPRESENTATIONS

21  AT ISSUE MATERIAL, YOU KNOW, SIGNIFICANT TO THEIR PURCHASING

22  DECISION, AND THAT CHANGING THEM, I.E., TAKING THEM OFF THE

23  PRODUCT WOULD AFFECT THEIR DECISION-MAKING.

24     SHE OPINED THAT SOME OF THEM, YOU KNOW, IT'S HARD TO KNOW

25  FOR SURE, BUT SOME OF THEM MIGHT NOT BUY THE PRODUCT.  SOME OF

1    THEM, ABSENT THOSE PHRASES BEING ON THE LABELS, WOULD ACTUALLY

2    READ THE INGREDIENT FACTS INSTEAD OF JUST RELYING ON THE

3    FRONT-OF-THE-PACKAGE LABELING.  SO THAT WOULD CHANGE CONSUMER

4    BEHAVIOR.

5        IT'S HARD TO KNOW EXACTLY, LIKE I SAID, A DOLLAR AMOUNT.

6    WE FEEL CONFIDENT THAT ONE MILLION WAS A WAY FAR CONSERVATIVE

7    NUMBER GIVEN THE SALES IN THIS CASE.  AND IF YOU CHANGE

8    CONSUMER BEHAVIOR FOR EVEN A SMALL PERCENTAGE, WHICH HER

9    RESEARCH SHOWS THAT IT WOULD BE MORE THAN A SMALL PERCENTAGE,

10   YOU WOULD BE GETTING A SIGNIFICANT BENEFIT HERE.

11       **THE COURT:**  WHAT IS THE PLAINTIFFS' DAMAGE THEORY?

12   HAD THE CASE GONE TO TRIAL, WHAT WOULD THE PLAINTIFFS BE

13   ASKING FOR AND WHY?

14       **MR. PIFKO:**  WELL, WE WOULD HAVE BEEN -- BECAUSE IT

15   WAS -- IN LIGHT OF THOSE FINDINGS THAT I DON'T HAVE THE EXACT

16   PERCENTAGES, BUT LIKE I SAID AROUND 35 TO 50 PERCENT OF CLASS

17   MEMBERS WOULD HAVE FOUND THESE PHRASES MATERIAL IN THEIR

18   PURCHASING DECISIONS, AND OUR CLASS REP, INDEED, FOUND THEM TO

19   BE MATERIAL.  UNDER STERNS AND --

20       **THE COURT:**  RIGHT.  BUT WHAT WOULD YOU HAVE STOOD UP

21   TO THE JURY AND SAID?  GIVE EACH PLAINTIFF "X" DOLLARS OR GIVE

22   THE CLASS "X" DOLLARS?  WHAT WOULD YOU ACTUALLY HAVE BEEN

23   ASKING FOR?

24       **MR. PIFKO:**  WE WOULD HAVE SOUGHT INJUNCTIVE RELIEF IN

25   THE FORM OF TAKING OFF THE OFFENDING PHRASES FROM THE

1    PACKAGING.  AND WE WOULD HAVE SOUGHT SOME SORT OF MONETARY

2    RESTITUTION TO CONSUMERS IN THE FORM OF EITHER PAYMENT FOR

3    PURCHASES THEY HAD MADE OR SOME SORT OF FREE PRODUCT IN

4    EXCHANGE TO COMPENSATE THEM FOR THE EXPENSE OF BUYING

5    SOMETHING THAT MAYBE WASN'T -- THEY WERE MISLED INTO BUYING

6    WITH RESPECT TO THE OFFENDING PHRASES.

7           **THE COURT:**  DO YOU AGREE WITH THAT?

8       IS THAT YOUR UNDERSTANDING OF WHAT THEIR MONETARY DAMAGE

9    THEORY WOULD HAVE BEEN?

10          **MR. NIERLICH:**  WELL, I RESPECTFULLY DISAGREE WITH THE

11   IDEA THEY WOULD BE ENTITLED TO ANY DAMAGES SINCE WE HAD --

12          **THE COURT:**  RIGHT.  NO, I'M ASKING YOU WHAT THEIR

13   THEORY WAS, NOT WHAT YOUR THEORY WAS.

14          **MR. NIERLICH:**  RIGHT.  MY UNDERSTANDING IS THAT

15   PLAINTIFFS' THEORY OF DAMAGES INCLUDED SEVERAL ELEMENTS, WHICH

16   WOULD BE INCLUDING RESTORATION OR RESTITUTION PURSUANT TO THE

17   UNFAIR COMPETITION LAW, ACTUAL DAMAGES --

18          **THE COURT:**  GIVING THE MONEY BACK --

19                 (SIMULTANEOUS COLLOQUY.)

20          **MR. NIERLICH:**  AND POTENTIALLY OTHER DAMAGES.

21          **THE COURT:**  BY RESTITUTION, YOU MEAN GIVING BACK THE

22   MONEY THEY PAID FOR THE PRODUCT?

23          **MR. NIERLICH:**  THAT'S RIGHT, SOME OR ALL OF IT.

24   CORRECT.

25          **THE COURT:**  IT COULD BE SOME.  YOU COULD SAY, WELL, I

1   WOULD HAVE PAID $3 HAD I KNOWN IT WAS FULL OF FAT, BUT I WOULD

2   ONLY HAVE PAID -- I WOULD HAVE PAID $4 HAD I REALLY THOUGHT IT

3   WASN'T FULL OF FAT, OR SOMETHING LIKE THAT, SO THEN YOU WOULD

4   GIVE THEM A DOLLAR BACK.

5          **MR. NIERLICH:**  PRESUMABLY THEY WOULD HAVE HAD A

6   DAMAGES EXPERT WHO WOULD HAVE LOOKED AT ISSUES LIKE THAT TO

7   TRY AND DETERMINE SOME DELTA BETWEEN THE PRODUCT AS SOLD AND

8   THE PRODUCT, AS THEY WOULD SAY, AS REPRESENTED.  BUT, AGAIN,

9   WE DISAGREE WITH THAT.

10         **THE COURT:**  OKAY.

11         **MR. PIFKO:**  YOUR HONOR, I FORGOT TO ADD, TOO,

12  PROBABLY ONE OTHER ASPECT WE WOULD HAVE BEEN SEEKING WOULD

13  HAVE BEEN SOME SORT OF CORRECTIVE ADVERTISING, YOU KNOW, LIKE

14  MAKING THEM ISSUE A PUBLIC STATEMENT THAT, HEY, WE CHANGED

15  THIS.

16         **THE COURT:**  THAT REMINDS ME, THOUGH, DO YOU THINK IT

17  WAS THE NOTICE TO THE CLASS ABOUT THE SETTLEMENT THAT TOLD A

18  LOT OF PEOPLE WHAT THE COMPLAINT ABOUT THE PRODUCT ACTUALLY

19  EVEN WAS?

20         **MR. PIFKO:**  THAT'S WHAT MADE ME JUST THINK OF THAT

21  POINT.

22      YES.  I BELIEVE CLASS MEMBERS WOULD NOT -- THEY WOULDN'T

23  HAVE KNOWN THAT THIS WAS GOING ON HAD IT NOT BEEN FOR THE

24  NOTICE.  THERE'S NO WAY THAT THEY WOULD HAVE -- YOU KNOW, THE

25  WHOLE IDEA OF ALL THESE CASES AND THAT IT'S A MISLEADING,

```
 1    FALSE ADVERTISING KIND OF CASE IS THAT THEY ARE BEING DUPED

 2    AND THEY DON'T KNOW.  SO ABSENT, YOU KNOW, PUBLIC MESSAGE

 3    BEING DISSEMINATED, THERE'S NO WAY THAT PEOPLE WOULD KNOW.

 4          THE COURT:  SO A LOT OF -- THE WAY A LOT OF PEOPLE

 5    FOUND OUT ABOUT THIS WAS NOT BECAUSE OF FDA LABELING, OR

 6    ADVERTISING, OR ANYTHING ELSE, BUT BECAUSE THEY GOT A NOTICE

 7    ABOUT BEING A CLASS MEMBER --

 8          MR. PIFKO:  A HUNDRED PERCENT, I WOULD SAY, YEAH.

 9       MAYBE ADD SOME MEDIA COVERAGE THAT TALKED ABOUT THE CASE.

10          THE COURT:  OKAY.  IS THERE ANYTHING ELSE THAT THE

11    PLAINTIFFS WOULD LIKE TO ADD?

12          MR. PIFKO:  I MEAN, I'M HAPPY TO RESPOND TO ANY

13    SPECIFIC QUESTIONS.  I DON'T WANT TO BELABOR POINTS THAT YOUR

14    HONOR HAS ALREADY CONSIDERED.

15       JUST OVERALL, I THINK WE FEEL VERY PLEASED WITH THE

16    RESULTS WE OBTAINED.  WE THINK THAT CASH PAYMENTS, THE

17    INJUNCTIVE RELIEF, AND THE PRODUCT DISTRIBUTIONS REALLY

18    ACCOMPLISH THE GOALS OF THE LITIGATION.  AND I THINK IT'S A

19    FAIR AND REASONABLE SETTLEMENT UNDER THE CIRCUMSTANCES.

20       THERE WERE CERTAINLY ISSUES THAT WE WOULD HAVE FACED IN

21    CONTINUING TO GO FORWARD, AND I THINK WE MADE AN APPROPRIATE

22    COMPROMISE WITH THE SETTLEMENT THAT WE PROPOSED.

23          THE COURT:  ANYTHING THE DEFENDANT WOULD LIKE TO ADD?

24          MR. NIERLICH:  YOUR HONOR, IT'S OUR POSITION THAT THE

25    SETTLEMENT TAKEN AS A WHOLE IS FAIR, REASONABLE, AND ADEQUATE
```

1    AND CONSISTENT WITH THE NINTH CIRCUIT AND OTHER GUIDANCE ON

2    THE MATTER.  IF THE COURT HAS NO FURTHER QUESTIONS, THEN I

3    WILL LEAVE IT THERE.

4           **THE COURT:**  ALL RIGHT.

5      SO, MR. CHAMBERLAIN, YOU HAD -- OR DO YOU STILL HAVE

6    SOMETHING YOU WOULD LIKE TO SAY?

7           **MR. CHAMBERLAIN:**  ABSOLUTELY.

8           **THE COURT:**  WOULD ONE OF YOU CONCEDE YOUR PODIUM TO

9    HIM?

10          **MR. CHAMBERLAIN:**  THANK YOU, YOUR HONOR.

11     THE SETTLEMENT CAN'T BE APPROVED.  I MEAN, IT HAS ALL

12   THREE OF THE INDICIA OF SELF-DEALING THAT THE NINTH CIRCUIT

13   IDENTIFIED IN BLUETOOTH; NAMELY, A CLEAR SAILING AGREEMENT OF

14   SOMETHING LIKE A KICKER AND A DISPROPORTIONATE DISTRIBUTION.

15     THE PROPER VALUATION OF THE SETTLEMENT IS AT MOST

16   $2.25 MILLION BECAUSE NEITHER THE -- NEITHER THE PRODUCT

17   DISTRIBUTION OR THE INJUNCTIVE RELIEF HAVE ANY REAL ECONOMIC

18   VALUE TO THE CLASS.

19     SO WE'LL START WITH THE PRODUCT DISTRIBUTION BECAUSE

20   THAT'S THE THING THAT'S GOTTEN THE MOST DISCUSSION.

21          **THE COURT:**  LET ME ASK YOU FIRST:  ARE YOU FAMILIAR

22   WITH THE ORIGINAL SETTLEMENT?

23          **MR. CHAMBERLAIN:**  NOT IN DETAIL, YOUR HONOR, NO.

24          **THE COURT:**  SO YOU DON'T KNOW THE DIFFERENCES BETWEEN

25   THE ORIGINAL SETTLEMENT THAT WAS NOT APPROVED AND THIS

```
 1    SETTLEMENT THAT WAS APPROVED PRELIMINARILY; YOU DON'T KNOW

 2    THOSE DIFFERENCES?

 3            MR. CHAMBERLAIN:  YOU'RE RIGHT, YOUR HONOR, I DON'T.

 4            THE COURT:  YOU DON'T KNOW WHAT WAS CHANGED IN

 5    BETWEEN?

 6            MR. CHAMBERLAIN:  NO, I DON'T.

 7            THE COURT:  YOU ARE MISSING SOME IMPORTANT

 8    INFORMATION THERE.

 9            MR. CHAMBERLAIN:  I MEAN, ALL I AM DOING IS COMPARING

10    THE SETTLEMENT THAT WAS OUT THERE THAT I RECEIVED NOTICE OF

11    WITH THE APPLICABLE LAW, BLUETOOTH AND DENNIS.

12            THE COURT:  YEAH.  THE OTHER ONE IS IN THE DOCKET, OF

13    COURSE, WASN'T IT?  THERE WAS --

14            MR. NIERLICH:  YES.

15            MR. PIFKO:  YES.

16            MR. CHAMBERLAIN:  YES.

17            THE COURT:  -- A MOTION FOR PRELIMINARY APPROVAL.

18    YOU DIDN'T READ THAT AND COMPARE WHAT WAS CHANGED IN BETWEEN?

19            MR. CHAMBERLAIN:  YOUR HONOR, NO, I DIDN'T MAKE THAT

20    SPECIFIC COMPARISON.

21            THE COURT:  OKAY.  AND THEN COULD YOU TELL ME YOUR

22    ASSESSMENT OF THE VALUE OF THIS CASE, OR THE DIFFICULTY OF THE

23    CASE, WHAT THE LEGAL THEORIES WERE, WHAT DIDN'T SURVIVE

24    MOTIONS TO DISMISS, WHAT DID SURVIVE MOTIONS TO DISMISS, WHAT

25    THE LIKELIHOOD WOULD BE OF THOSE CASES?
```

1          **MR. CHAMBERLAIN:** NO, YOUR HONOR. ALL I HAVE IS THE

2    AGREEMENT THAT THE PARTIES MADE. AND I BASE MY ANALYSIS --

3          **THE COURT:** RIGHT. THE MOTIONS TO DISMISS ARE ALSO

4    IN THE DOCKET.

5          **MR. CHAMBERLAIN:** YES, YOUR HONOR.

6          **THE COURT:** ONE COULD HAVE READ THOSE.

7          **MR. CHAMBERLAIN:** I MEAN, MY CONTENTION IS THAT

8    ASSESSING THE ECONOMIC VALUE OF ANY SETTLEMENT IS

9    EXTRAORDINARY AND DIFFICULT BECAUSE, I MEAN, WE HAVE TO KIND

10   OF PLAY OUT HYPOTHETICALLY WHAT THE SETTLEMENT WOULD HAVE

11   LOOKED LIKE. SO THE BEST PLACE TO START IS WITH THE NUMBER,

12   THE AMOUNT OF CASH THAT THE PARTIES AGREED TO DISTRIBUTE.

13         **THE COURT:** YOU ARE NOT QUARRELING WITH THAT. YOU

14   DON'T THINK IT'S WORTH MORE THAN 2.25 MILLION.

15         **MR. CHAMBERLAIN:** I THINK IT'S WORTH AT LEAST 2.25

16   MILLION. MY ASSESSMENT IS THAT IT'S PROBABLY WORTH BETWEEN

17   THREE TO 3.5, AND I WILL EXPLAIN WHY.

18         **THE COURT:** WHY? OKAY. EXPLAIN WHY THEN.

19         **MR. CHAMBERLAIN:** THE REASON IS THAT -- THE REASON IS

20   THAT THERE ARE PROVISIONS IN THE AGREEMENT, AND THIS IS

21   ACTUALLY IDENTIFIED IN BLUETOOTH, THE CLEAR SAILING PROVISION

22   AND THE KICKER PROVISION THAT ARE EXPLICITLY THINGS THAT ARE

23   UNIQUELY TO THE BENEFIT OF CLASS COUNSEL, AND THAT CLASS

24   COUNSEL CONCEIVABLY WOULD HAVE HAD TO NEGOTIATE TO GET.

25   THAT'S ACTUALLY IN THE BLUETOOTH OPINION.

1          **THE COURT:**  WHAT I'M INTERESTED IN IS WHAT YOU THINK

2     THE VALUE OF THE CASE IS IN SETTLEMENT.

3          **MR. CHAMBERLAIN:**  I MEAN --

4          **THE COURT:**  YOU SAID IT WAS -- YOU SAID THIS

5     SETTLEMENT IS REALLY 2.25 AND YOU THINK THE CASE IS WORTH AT

6     LEAST 3.25.

7          **MR. CHAMBERLAIN:**  YES.

8          **THE COURT:**  AND I AM WONDERING WHY YOU THINK THAT IF

9     YOU HAVEN'T READ THE MOTIONS TO DISMISS.

10          **MR. CHAMBERLAIN:**  SO I WANT TO CLARIFY.  I THINK IT'S

11     AT LEAST WORTH 2.25 AND PROBABLY WORTH A LITTLE MORE.

12          **THE COURT:**  A LITTLE MORE.

13          **MR. CHAMBERLAIN:**  IN THE NEIGHBORHOOD OF THREE.

14     BECAUSE I COMPARE IT TO SIMILAR SETTLEMENTS WHERE --

15          **THE COURT:**  THAT'S WHAT I'M TRYING TO ASK IS, WHY DO

16     YOU THINK IT'S WORTH THREE INSTEAD OF 2.25, ASSUMING IT'S

17     WORTH 2.25?

18          **MR. CHAMBERLAIN:**  SO IN SIMILAR SETTLEMENTS WHERE THE

19     ATTORNEYS NEGOTIATE OR ARE WILLING TO ONLY GET ABOUT 750,000

20     IN FEES, THE CLASS RELIEF ENDS UP BEING IN THE NEIGHBORHOOD --

21     OR THE TOTAL FUND ENDS UP BEING IN THE NEIGHBORHOOD OF

22     $3.5 MILLION.

23          FOR EXAMPLE, IN THE VIBRAM FIVEFINGERS SETTLEMENT RECENTLY

24     IN THE DISTRICT OF MASSACHUSETTS, THAT WAS THE SETTLEMENT

25     AGREEMENT THAT WAS FOUND.  IT WAS 3.5 MILLION TOTAL FOR THE

1    FUND, AND THE LAWYERS WERE ONLY GETTING 775,000.

2        HERE, IF YOU THINK ABOUT IT, THESE PLAINTIFFS' LAWYERS

3    WOULD HAVE BEEN MORE RELUCTANT TO TAKE THAT SETTLEMENT EVEN

4    THOUGH IT WAS FAR BETTER FOR THE CLASS BECAUSE THE WAY THE

5    SETTLEMENT IS STRUCTURED, TO FAVOR THE PLAINTIFFS' LAWYERS AT

6    THE EXPENSE OF THE CLASS, MAKES IT SO THAT LESS RELIEF FOR THE

7    CLASS IS ACTUALLY BETTER HERE.  THAT'S THE REAL REASON.

8        THE REASON IT'S SUBSTANTIVELY UNFAIR IS NOT THAT

9    NECESSARILY 2.25 IS THE WRONG NUMBER, BUT IT'S THAT BECAUSE OF

10   THE STRUCTURE OF THE PROVISIONS, THAT IF YOU REDUCE THE

11   ATTORNEYS' FEES, THEY -- YOU CAN'T INCREASE THE CLASS PAYOUT.

12   THEY CAPPED THE CLASS PAYOUT AT A MILLION DOLLARS IN CASH.

13       BECAUSE YOU CAN'T DO THAT, YOU CAN'T GET THE CLASS THE

14   RELIEF THAT GIBSON, DUNN IS WILLING TO PAY.  THAT'S WHAT MAKES

15   IT SUBSEQUENTLY UNFAIR.  THAT'S ACTUALLY VERY SIMILAR TO THE

16   NINTH CIRCUIT'S LOGIC IN THE BLUETOOTH CASE.

17       BUT TO GET TO THAT NUMBER, THERE HAS TO BE -- YOU HAVE TO

18   VALUE THE PRODUCT DISTRIBUTION AND THE INJUNCTIVE RELIEF.  I

19   CONTEND THAT THE VALUE OF THOSE SHOULD BE NEGLIGIBLE.

20       SO, FIRST, ON THE PRODUCT DISTRIBUTION.  THE BIG QUESTION

21   IS, FIRST, WHETHER THIS IS ACTUALLY CY-PRES BECAUSE BOTH THE

22   PARTIES SEEM -- PUSH THE ARGUMENT THAT IT'S NOT CY-PRES

23   BECAUSE THERE'S A DIRECT DISTRIBUTION OF PRODUCT TO THE CLASS.

24       BUT THAT'S NOT A THEORY THAT THE NINTH CIRCUIT OR ANYONE

25   ELSE HAS UPHELD.  AND, INDEED, THE NINTH CIRCUIT IN LANE

1    TALKED ABOUT HOW CY-PRES IS JUST AN INDIRECT DISTRIBUTION TO

2    THE CLASS AS OPPOSED TO A DIRECT MONETARY DISTRIBUTION.

3         AND I WOULD PROFFER THAT A DIRECT DISTRIBUTION WHERE YOU

4    HAVE TO GO TO A CHARITABLE ATHLETIC EVENT TO GET A PRODUCT IS

5    VERY INDIRECT AND VERY MUCH WITHIN CY-PRES.  AND UNDER THE --

6         **THE COURT:**  WHAT WOULD YOU SUGGEST?  LETTING PEOPLE

7    MAIL IN AND ASK BARS TO BE MAILED TO THEM?

8         **MR. CHAMBERLAIN:**  I MEAN, ODDLY ENOUGH, COUPONS WOULD

9    BE MUCH BETTER.  RIGHT?  THEY COULD -- FUNNY WAY TO THINK

10   ABOUT IT, THIS IS SORT OF THE WORST COUPON IN THE WORLD, A

11   COUPON YOU HAVE TO GO TO A MARATHON TO REDEEM.  I MEAN, IF

12   IT'S NOT CY-PRES, THAT'S ONE WAY OF THINKING ABOUT IT.

13        BUT I THINK THE BETTER -- THAT WOULD HAVE BEEN A BETTER

14   SOLUTION FOR THE CLASS RATHER THAN HAVING TO GO TO ONE OF

15   THESE EVENTS, DRIVE 30 MILES TO REDEEM -- TO GET A MUSCLE MILK

16   LIGHT.  THAT'S NOT A CLASS BENEFIT.

17        **THE COURT:**  MIGHT HAVE BEEN CHEAPER FOR THE DEFENDANT

18   TO DO THAT.

19        **MR. CHAMBERLAIN:**  IT MIGHT WELL HAVE BEEN.  BUT I

20   THINK THAT THEY ARE LOSING OUT ON THE ADVERTISING BENEFITS OF

21   HAVING THIS TABLE AT AN EVENT, AND ESPECIALLY WITH A WHOLE

22   BUNCH OF PEOPLE WHO AREN'T CLASS MEMBERS, WHO AREN'T PEOPLE

23   WHO PURCHASED MUSCLE MILK IN THE PAST.  THESE ARE THE PEOPLE

24   WHO, YOU KNOW, MARATHON RUNNERS WHO THEN WILL SEE MUSCLE MILK

25   LIGHT AND WANT TO PURCHASE IT.

1    AND THAT'S THE PROBLEM IDENTIFIED BY THE NINTH CIRCUIT IN

2    NACHSHIN AND DENNIS, IS THAT WHEN YOU LET THE PARTIES GET AWAY

3    FROM THE NEXUS OF THE LAWSUIT WITH THEIR SELECTION OF CY-PRES

4    RECIPIENTS, THEY DO IT TO SERVE THEIR SELF-INTERESTS AND NOT

5    THE INTERESTS OF THE CLASS.

6    AND AS A CY-PRES RECIPIENT, THE CHARITABLE ATHLETIC

7    EVENTS, THAT'S EXCLUDED UNDER DENNIS VERSUS KELLOGG.  DENNIS

8    SAYS THAT IT MUST BE TIED TO THE NATURE OF THE LAWSUIT.  AND

9    DENNIS IS DIRECTLY ON POINT.  THAT SETTLEMENT WAS ABOUT FALSE

10   ADVERTISING OF CEREAL.  AND THE PARTIES WANTED TO DO A CY-PRES

11   DISTRIBUTION WHERE THEY GIVE CEREAL TO, YOU KNOW, NONPROFITS

12   THAT HELP FEED THE HUNGRY.  AND THE NINTH CIRCUIT SAID THAT'S

13   NOT THE NEXUS OF THE LAWSUIT.  THE NEXUS OF THE LAWSUIT IS

14   THIS IS FALSE ADVERTISING.

15   SO THE APPROPRIATE CY-PRES RECIPIENT IS A NONPROFIT

16   DEDICATED TO STOPPING FALSE ADVERTISING TO MAKE CONSUMERS

17   AWARE OF THAT.  I MEAN, THAT'S DIRECTLY ON POINT.  THERE'S NO

18   DISCUSSION OF DENNIS -- OF THIS SUBSTANTIVE PART OF DENNIS IN

19   THE PARTIES' RESPONSES TO MY OBJECTION.

20   AND THAT MEANS THAT IF YOU TREAT THIS AS CY-PRES, YOU HAVE

21   TO VALUE IT AT ZERO.  AND IF YOU DON'T TREAT IT AS CY-PRES,

22   THAT DOESN'T -- THERE'S NOT REALLY AMAZING LAW SAYING THIS IS

23   WHAT CY-PRES IS AND THIS IS WHAT CY-PRES ISN'T, BUT THE -- YOU

24   STILL HAVE TO GIVE EXTREME SCRUTINY -- YOU HAVE GIVEN A GREAT

25   DEAL OF SCRUTINY, YOUR HONOR, TO IT HERE, BUT EXTREME SCRUTINY

1   TO NONMONETARY RELIEF.  AND HERE, I THINK IT DOESN'T HAVE REAL

2   ECONOMIC VALUE TO THE CLASS.  A CARTON OF MUSCLE MILK THAT YOU

3   HAVE TO GO TO A MARATHON TO GET, IS ONE THAT VERY FEW CLASS

4   MEMBERS WILL GO AND GET.  AND THE FACT THAT THEY MAKE

5   REASONABLE EFFORTS --

6           **THE COURT:**  I DON'T KNOW WHY YOU SAY THAT.

7           **MR. CHAMBERLAIN:**  JUST, I MEAN, I PERSONALLY AM NOT

8   GOING TO GO TO SUSAN KOMEN TO PICK UP A MUSCLE MILK.  THAT'S

9   JUST MY PERSONAL VALUE --

10          **THE COURT:**  RIGHT.  I'M SURE THAT'S THE CASE, BUT

11  THAT DOESN'T TELL ME TOO MUCH ABOUT THE OTHER THOUSANDS OF

12  PEOPLE.

13      ANYWAY, GO AHEAD.

14          **MR. CHAMBERLAIN:**  SO THAT'S A PROBLEM THERE.

15      SO I THINK THAT'S ENOUGH TO SAY THAT EVEN IF IT'S NOT

16  CY-PRES, IT SHOULD STILL BE VALUED AS HAVING NEGLIGIBLE VALUE

17  TO THE CLASS.

18      AND, MOREOVER, YOU HAVEN'T -- THERE'S NO POINT, EVEN AT

19  THIS HEARING OR ANY FUTURE HEARING, IF YOU LOOK AT THEIR

20  AGREEMENT, WHERE YOU FIND OUT HOW MANY CLASS MEMBERS ACTUALLY

21  BENEFITED FROM THIS DISTRIBUTION.  THEY WILL TELL YOU HOW MANY

22  PRODUCTS THEY DISTRIBUTED, THEY WILL TELL YOU WHERE THEY

23  DISTRIBUTED THEM, BUT THEY WON'T TELL YOU -- AND THEY CAN'T

24  REALLY TELL YOU HOW MANY CLASS MEMBERS, HOW MANY PEOPLE WHO

25  PURCHASED MUSCLE MILK IN THE LAST FIVE YEARS, WILL BENEFIT

1    FROM THIS DISTRIBUTION.

2        SO WITH THAT, I THINK THE NINTH CIRCUIT PRECEDENT REQUIRES

3    THAT YOU FIND ITS VALUE TO BE NEGLIGIBLE.

4        ON THE INJUNCTIVE RELIEF, THE BIG PROBLEM WITH THE

5    INJUNCTIVE RELIEF IS THAT IT'S DUPLICATIVE OF WORK THAT THE

6    FDA IS ALREADY DOING.  THIS WHOLE LAWSUIT IS BASED ON A FDA

7    WARNING LETTER THAT WAS FILED TWO WEEKS BEFORE THE PLAINTIFFS

8    FILED THEIR COMPLAINT OVER THE SAME FUNDAMENTAL CLAIMS.

9        **THE COURT:**  WELL, PERHAPS SO, BUT IT HAD NOT BEEN

10   DETERMINED WHAT THEY WOULD HAVE TO DO AND WHAT THEY WOULD HAVE

11   HAD TO DO WAS NOT THE NOTICE TO THOUSANDS OF CLASS MEMBERS.

12       **MR. CHAMBERLAIN:**  TRUE.  AND I THINK IT IS FAIR TO

13   SAY THAT THE NOTICE IS A CLASS BENEFIT FOR THAT REASON.

14       LIKE, I MEAN, ALL THE MONEY THAT'S SPENT TO GIVE PEOPLE

15   NOTICE OF THE CLASS SETTLEMENT, BUT THAT'S NOT A REASON WHY

16   THE INJUNCTIVE RELIEF IS A BENEFIT TO THE CLASS.  THE

17   INJUNCTIVE RELIEF IS CYTOSPORT SAYING, WE WOULDN'T DO THIS

18   ANYMORE.  AND THE FDA HAS ALREADY TOLD THEM NOT TO DO IT.

19       AND IF YOU LOOK AT THEIR AGREEMENT, THEY HAVE AGREED

20   NOT -- THEY AGREED IN 2011 NOT TO INCLUDE THE WORDS "HEALTHY

21   SUSTAINED ENERGY" ON THEIR PRODUCTS.  AND THERE IS THIS

22   QUESTION OF WHETHER OR NOT THEY HAD PREVIOUSLY AGREED TO USE

23   THE WORD "HEALTHY FATS" ON THEIR PRODUCTS, BUT THERE'S ALSO --

24   YOU KNOW, THERE'S A SPECIFIC EXHIBIT, THERE'S -- IT'S

25   DOCUMENT 27, EXHIBIT C, AND IT TALKS ABOUT HOW THEY WERE

1    UNABLE TO GET A RESPONSE FROM THE FDA TO SOME OF THEIR

2    DEFENSES TO THE ACCUSATION IN THE WARNING LETTER, AND THAT

3    THEY HAVE UNDERTAKEN TO MAKE QUOTE "FURTHER REVISIONS

4    INCORPORATING MANY OF THE CHANGES DEEMED NECESSARY IN THE

5    WARNING LETTER."

6        WE DON'T KNOW WHAT THOSE -- OR I DON'T.  I'M NOT SURE

7    WHAT -- WHAT EXACTLY THEY ARE.  BUT IF THEY ARE NO DIFFERENT

8    THAN THE THINGS THAT THEY WERE DOING IN RESPONSE TO THE FDA'S

9    PROMPTING, THE VALUE OF THAT INJUNCTION TO CLASS MEMBERS IS

10    NEGLIGIBLE.

11        THE NOTICE MIGHT BE VALUABLE, KNOWING THAT THE PRODUCT IS

12    NOT WORTH ANYTHING VALUABLE, BUT, INDEED, THE INJUNCTION

13    DOESN'T ACTUALLY CREATE THE KNOWING.  REMOVING THE WORDS

14    "HEALTHY FATS" FROM THE SIDE OF THE BOTTLE, DOESN'T ITSELF

15    INFORM CLASS MEMBERS.  AND THAT'S WHAT THE INJUNCTIVE RELIEF

16    IS ALL ABOUT.

17        SO, IN ADDITION, THE INJUNCTIVE RELIEF IS PROSPECTIVE.  IT

18    DOESN'T REMEDY HARMS TO CLASS MEMBERS DONE IN THE PAST.  SO

19    OUR CONTENTION -- MY CONTENTION IS THAT THAT SHOULD BE VALUED

20    AT ZERO.  AND AT THE POINT THAT IT'S VALUED AT ZERO, THE TOTAL

21    VALUE OF THE SETTLEMENT IS 2.25 MILLION, AND THE ATTORNEYS'

22    FEES ARE 990,000 SOMETHING.  I DON'T REMEMBER THE EXACT

23    FIGURE, BUT IT'S SOMETHING IN THAT NEIGHBORHOOD.  I'M NOT SURE

24    WHAT THE FIGURE ON THAT IS, BUT THAT'S WELL ABOVE 25 PERCENT,

25    THAT'S WELL ABOVE THE BENCHMARK IN BLUETOOTH THAT THE NINTH

```
 1    CIRCUIT HAS SET --
 2              THE COURT:  WHAT ABOUT THE LODESTAR?
 3              MR. CHAMBERLAIN:  THE LODESTAR, YOUR HONOR, WHEN --
 4    IS -- CAN BE USED AS A CROSS-CHECK TO ENSURE THAT THE
 5    PERCENTAGE OF -- THE AMOUNT OF MONEY IS NOT A WINDFALL, BUT IN
 6    A SITUATION WHERE THE OVERALL SETTLEMENT VALUE IS PRETTY
 7    SMALL, THE NEED FOR A LODESTAR CROSS-CHECK -- THE LODESTAR IS
 8    JUST A WORST METHOD TO USE THAN PERCENTAGE OF THE FUND,
 9    BECAUSE PERCENTAGE OF THE FUND ALIGNS THE INCENTIVES.
10              THE COURT:  IS THERE ANYTHING WRONG WITH USING A
11    LODESTAR?
12              MR. CHAMBERLAIN:  UM, I'M NOT ACTUALLY SURE, YOUR
13    HONOR, WHAT THE LAW IS WHEN THE PARTIES REQUEST PERCENTAGE OF
14    THE FUND OR THAT THEIR FEES BE CALCULATED.
15              THE COURT:  WHEN WHAT?  I AM SORRY.
16              MR. CHAMBERLAIN:  WHEN THE --
17              THE COURT:  "I'M NOT SURE WHAT THE LAW IS WHEN" WHAT?
18              MR. CHAMBERLAIN:  WHEN THE PARTIES REQUEST THAT THE
19    FEE BE CALCULATED AS A PERCENTAGE OF THE FUND, BUT THEY ALSO
20    PRESENT A LODESTAR FIGURE, I'M NOT SURE WHAT THE LAW IS WITH
21    REGARD TO YOUR DISCRETION AS TO UNILATERALLY APPLY THE
22    LODESTAR FIGURE.
23         I THINK THAT PERCENTAGE OF THE FUND IS THE BEST WAY
24    BECAUSE IT ALIGNS THE INCENTIVES OF THE PLAINTIFFS AND THE
25    REST OF THE CLASS.  THE MORE RECOVERY THEY GET FOR THE CLASS,
```

1  THE MORE THEY GET THEMSELVES.

2      AND PART OF THE PROBLEM WITH THE SETTLEMENT IS THE

3  DIFFERENT, YOU KNOW, THINGS THAT THEY HAVE ADDED, THE

4  INJUNCTIVE RELIEF AND THE PRODUCT DISTRIBUTION, CREATE THE

5  ILLUSION OF GREATER RELIEF THAN THERE REALLY IS IN ORDER TO

6  JUSTIFY A GREATER FEE.  AND THAT'S PART OF THE INDICIA OF

7  SELF-DEALING THAT THE NINTH CIRCUIT IDENTIFIED IN BLUETOOTH.

8      THOSE ARE THE TWO MAJOR REASONS WHY THE SETTLEMENT'S

9  UNFAIR.  YOU HAVE ALL THREE OF THE FACTORS IN BLUETOOTH.

10  THERE'S ALSO THE KIND OF -- ONE TRICKY ISSUE IS THIS KICKER

11  ARGUMENT.

12      NORMALLY, A KICKER IS JUST A PROVISION THAT SAYS IF THE

13  COURT REDUCES THE FEE, THAT MONEY WILL GO BACK TO THE

14  DEFENDANT.  SO THAT'S NOT PRESENT HERE.  BUT THEY HAVE A SET

15  OF PROVISIONS THAT ENSURE THAT IF YOU REDUCE THE FEE, WHAT

16  HAPPENS IS, THE OVERALL AMOUNT OF PRODUCT DISTRIBUTIONS GOES

17  UP.  BUT THAT'S EFFECTIVELY THE SAME THING AS A KICKER.

18      BECAUSE IF CYTOSPORT IS PRESENTED WITH THE OPTION OF

19  GIVING -- EITHER PAYING $5 TO A CLASS MEMBER OR GIVING AWAY A

20  CARTON OF MUSCLE MILK, WHICH THEY ARE IN THE BUSINESS OF

21  MAKING, THEY WILL ALWAYS CHOOSE GIVING AWAY THE MUSCLE MILK.

22  AND IT HAS THE EFFECT OF MASSIVELY REDUCING THE OVERALL COST

23  TO CYTOSPORT OF THE SETTLEMENT.

24      AND GIVEN, AGAIN, THAT THE PRODUCT DISTRIBUTION HAS SUCH A

25  WEAK NEXUS TO THE CLASS, SO FEW CLASS MEMBERS WILL CONSUME THE

1    CYTOSPORT AT THESE CHARITABLE EVENTS, IT'S FUNCTIONALLY THE

2    SAME THING AS THE KICKER.

3        AND WHAT THE NINTH CIRCUIT EMPHASIZED IN BLUETOOTH AND

4    DENNIS IS THAT THIS IS A HOLISTIC EVALUATION OF THE

5    SETTLEMENT.  THE PARTIES MIGHT TRY AND SAY, NO, THIS ISN'T

6    TECHNICALLY A KICKER, THEREFORE, YOU DON'T HAVE TO TREAT IT AS

7    AN INDICATOR OF SELF-DEALING, BUT, YOU KNOW, THE PURPOSE HERE

8    IS TO FIGURE OUT WHETHER THE SETTLEMENT IS FAIR.  AND IF A SET

9    OF PROVISIONS HAS THE SAME FUNCTIONS AS A KICKER, IT SHOULD BE

10   TREATED AS SUCH AND SEEN AS THE INDICIA OF SELF-DEALING THAT

11   IT IS.

12       BUT, WITH THAT, I THINK THOSE ARE MY MAJOR OBJECTIONS.

13           **THE COURT:**  DID YOU WANT TO RESPOND?

14         **MR. NIERLICH:**  IF I MAY, YOUR HONOR.

15       MR. CHAMBERLAIN'S OBJECTIONS APPEAR TO BOIL DOWN TO HIM

16   SUGGESTING THAT HE THINKS PERHAPS MORE CASH SHOULD HAVE BEEN

17   PROVIDED TO MEMBERS OF THE CLASS.

18       I NOTE HE DESCRIBED THAT THE AGREEMENT CAPPED THE CLASS

19   PAYOUT AT $1 MILLION.  AND AS YOUR HONOR WILL REMEMBER, IN THE

20   ORIGINAL VERSION OF THE SETTLEMENT AGREEMENT, IT PROVIDED FOR

21   CLASS MEMBERS, PROPOSED CLASS MEMBERS TO MAKE A CLAIM, AND

22   THEN TO PAY UP TO $30.

23       IN THE REVISED SETTLEMENT, IT PROVIDED FOR A $1 MILLION

24   FUND.  AS IT TURNS OUT, DUE TO THE NUMBER OF CLAIMANTS, THE

25   CLAIMANTS WILL RECEIVE APPROXIMATELY $30.  IN OTHER WORDS, THE

1   AMOUNT THAT WOULD HAVE BEEN --

2           **THE COURT:**  ODDLY ENOUGH.

3           **MR. NIERLICH:**  -- THE MAXIMUM PREVIOUSLY.  JUST

4   WORKED OUT WE GOT ABOUT 33,000 CLAIMANTS.

5       SO, IN FACT, THAT MILLION-DOLLAR FUND DID NOT ACT AS SOME

6   CAP.  HAD WE GONE UNDER THE ORIGINAL SETTLEMENT AGREEMENT,

7   WE'D BE DISTRIBUTING, YOU KNOW, PERHAPS A LITTLE BIT LESS

8   BECAUSE IT PROVIDED FOR UP TO $30 INSTEAD OF $30.

9           **THE COURT:**  UP TO $30 WHAT, BASED ON HOW MUCH THEY

10  HAD BOUGHT, OR SOMETHING LIKE THAT?

11          **MR. NIERLICH:**  BASED ON CLAIMS PROCEDURE THAT

12  INCLUDED SOME FACTORS SUCH AS VOLUME OF PURCHASE.  AND THEN

13  THE REVISED SETTLEMENT AGREEMENT PROVIDED AN EASIER CLAIMS

14  PROCESS WHICH ONE HOPES RESULTED IN ADDITIONAL CLAIMS BEING

15  ABLE TO BE MADE.  BUT, IN ANY EVENT, I NOTE $30 PROVIDED.

16      MR. CHAMBERLAIN HAS NOT PROVIDED ANY EVIDENCE INDICATING

17  WHAT HE THINKS THE VALUE OF ANY SETTLEMENT HERE SHOULD HAVE

18  BEEN, IF NOT THE VALUE OF THE SETTLEMENT THAT WAS PROVIDED

19  HERE, AND INSTEAD SEEMS TO FOCUS HIS OBJECTIONS ON THE NOTION

20  THAT THE PRODUCT DISTRIBUTION AND INJUNCTIVE RELIEF ARE BOTH

21  WORTHLESS.

22          **THE COURT:**  I THINK THE BASIC ARGUMENT IS THAT THE

23  VALUE OF THE SETTLEMENT IS REALLY THE AMOUNT OF CASH THAT WAS

24  PAID BECAUSE THAT'S THE AMOUNT YOUR CLIENT WAS WILLING TO PAY

25  IN CASH AND, THEREFORE, THE VALUE OF THE SETTLEMENT IS 2.25.

1    AND, THEREFORE, AT A PERCENTAGE OF COMMON FUND THEORY LESS

2    SHOULD HAVE BEEN GIVEN TO ATTORNEYS' FEES.

3         **MR. NIERLICH:** BUT THE ANALYSIS IS NOT THE AMOUNT OF

4    PAIN THAT IS VISITED UPON THE DEFENDANT. THE ANALYSIS IS THE

5    BENEFIT TO THE CLASS.

6       AND CERTAINLY HAVING PRODUCT DISTRIBUTED IS A BENEFIT TO

7    THE CLASS. ONE MAY QUIBBLE WITH THE PRECISE VALUATION, BUT TO

8    SAY THAT IT'S WORTHLESS SEEMS TO ME TO NOT FIT WITH REALITY.

9    I MEAN, THERE'S CLEARLY A BENEFIT TO HAVING THE PRODUCT

10   DISTRIBUTED, AND THIS IS NOT CY-PRES. THIS IS A PRODUCT

11   DISTRIBUTION. IT'S ANOTHER WAY TO REACH CLASS MEMBERS.

12   AND --

13        **THE COURT:** ORIGINALLY YOU WERE PLANNING ON GIVING IT

14   OUT TO PEOPLE IN HOSPITALS AND CHILDREN, OR SOMETHING LIKE

15   THAT, AND I --

16        **MR. NIERLICH:** RIGHT.

17        **THE COURT:** -- I TAKE SOME ISSUE WITH THAT, AND YOU

18   CHANGED IT TO THIS.

19        **MR. NIERLICH:** THAT'S RIGHT, YOUR HONOR.

20        **THE COURT:** IT'S A DIFFERENT PRODUCT THAT YOU WERE

21   GOING TO GIVE OUT BEFORE.

22        **MR. NIERLICH:** CORRECT. AND THE EFFORT HERE HAS BEEN

23   TO TRY TO MAKE SURE THAT WE HAVE THAT NEXUS AND WE ARE ACTING

24   CONSISTENTLY WITH THE NINTH CIRCUIT'S GUIDANCE IN THAT REGARD.

25       MR. CHAMBERLAIN CITED THE <u>NACHSHIN V. AOL</u> CASE, AND IN

1    THAT CASE THE NINTH CIRCUIT TELLS US THAT THERE MUST BE A

2    DRIVING NEXUS BETWEEN THE PLAINTIFF CLASS AND THE CY-PRES

3    BENEFICIARIES.  AND SO EVEN IF YOU WERE TO GIVE US A CY-PRES,

4    WHICH I WOULD NOT SAY IT IS, I THINK IT'S A PRODUCT

5    DISTRIBUTION TO THE CLASS, THERE IS STILL A NEXUS.

6        THE PLAINTIFFS IN THEIR PAPERS CITED THE FACT THAT MUSCLE

7    MILK PRODUCTS ARE TARGETED TO PEOPLE WITH AN ACTIVE LIFESTYLE.

8    THE CLAIMS IN THIS CASE HAVE TO DO WITH USE OF THE WORD

9    "HEALTHY", AND THE EVENTS TARGETED ARE CHARITABLE ATHLETIC

10   EVENTS RELATED TO HEALTH THEMES.

11       I MEAN, THERE HAS BEEN A SUBSTANTIAL EFFORT HERE TO TARGET

12   THIS TO TRY AND MAKE SURE THAT THE PRODUCT DISTRIBUTION, TO

13   THE EXTENT FEASIBLE, IS GOING TO BE TARGETED TO CLASS MEMBERS,

14   AND SO I SUGGEST THAT YOU SHOULD LOOK AT IT THAT WAY.  BUT

15   EVEN IF YOU LOOKED AT IT AS CY-PRES, IT WOULD MEET THE

16   REQUIREMENTS UNDER THE NINTH CIRCUIT STANDARDS.

17           **THE COURT:**  ANY PARTICULAR REASON YOU DIDN'T AGREE ON

18   COUPONS OR MAILING PEOPLE MUSCLE MILK BARS?

19           **MR. NIERLICH:**  WELL, TO DISTRIBUTE -- THE QUESTION IS

20   WHAT YOU ARE TRYING TO ACCOMPLISH.  AND IF YOU ARE TRYING TO

21   REACH A BROADER SWATH OF THE CLASS, THEN SIMPLY GIVING

22   SOMETHING ELSE TO PEOPLE WHO FILED A CLAIM, IS NOT REACHING

23   MORE PEOPLE AND MAYBE GIVING A LITTLE SOMETHING MORE TO THOSE

24   PEOPLE, BUT THOSE PEOPLE ARE ALREADY RECEIVING AS MUCH OR MORE

25   THAN THEY WOULD HAVE UNDER THE ORIGINAL SETTLEMENT, GETTING

1    $30 IN CASH.

2        SO THE PRODUCT DISTRIBUTION PROVIDES YOU AN OPPORTUNITY TO

3    HAVE ANOTHER AVENUE FOR REACHING MEMBERS OF THE CLASS, AND TRY

4    TO BROADEN THAT REACH.

5        SO I WOULD SAY THAT IS ANOTHER ADVANTAGE OF THE PRODUCT

6    DISTRIBUTION.  PLUS, FRANKLY, JUST THE COST OF MAILING A

7    BOTTLE OF LIQUID PRODUCT WOULD BECOME --

8            **THE COURT:**  WELL, THAT WOULD BE A PROBLEM.

9            **MR. NIERLICH:**  -- VERY EXPENSIVE.

10           **THE COURT:**  BUT THE BAR WOULDN'T BE SO BAD.

11           **MR. NIERLICH:**  THAT'S TRUE --

12           **THE COURT:**  YOU HAVE TO GO INTO ALL THE CAFA

13   REQUIREMENTS ABOUT COUPON SETTLEMENTS.

14           **MR. NIERLICH:**  ONE MIGHT WANT TO STAY CLEAR OF THOSE

15   WHERE POSSIBLE.

16           **THE COURT:**  OKAY.  WAS THERE ANYTHING ELSE?

17           **MR. NIERLICH:**  I WAS JUST GOING TO SAY WITH RESPECT

18   TO THE INJUNCTIVE RELIEF, IF I MAY, AN FDA WARNING LETTER IS

19   NOT A FINAL ACTION OR REQUIREMENT OF THE FDA.  THERE WAS NO

20   REQUIREMENT BY THE FDA TO UNDERTAKE THE STEPS THAT ARE

21   REFLECTED IN THE INJUNCTIVE RELIEF IN THIS CASE.

22       IF THE INJUNCTIVE RELIEF IN THIS CASE -- I MEAN, FROM OUR

23   PERSPECTIVE, IT CERTAINLY ISN'T WORTHLESS.  IT CERTAINLY

24   DOESN'T HAVE NO IMPACT ON THE COMPANY.

25       I UNDERSTAND THE PLAINTIFFS HAVE MADE THE POSITION THAT IT

1  ADDRESSES THE CLAIMS THEY RAISED.  AND WHILE WE DISAGREE WITH

2  THEM ABOUT THE MERITS OF THEIR CLAIMS, THE FACT REMAINS THAT

3  THE INJUNCTIVE RELIEF DIRECTLY ADDRESSES THE CLAIMS THEY MADE.

4          **THE COURT:**  OKAY.  DID YOU WANT TO RESPOND?

5          **MR. PIFKO:**  YES, THANK YOU, YOUR HONOR.  I WON'T MAKE

6  IT TOO LONG.  I WANTED TO ECHO A COUPLE OF MR. NIERLICH'S

7  POINTS AND ADD A COUPLE OF MY OWN.

8      FIRST, WITH RESPECT TO THE PRODUCT DISTRIBUTION, I

9  COMPLETELY ECHO THE POINT THAT PART OF THE POINT OF PROVIDING

10  DISTRIBUTIONS OF PRODUCT IS TO REACH A BROADER GROUP.  YOU

11  KNOW, IF WE JUST SENT COUPONS, WE WOULD BE SENDING THE SAME --

12  THE ONLY PEOPLE WHO WOULD BENEFIT ARE THE 33,000 PEOPLE WHO

13  CAME FORWARD AND MADE CLAIMS.

14      AS YOU KNOW IN YOUR EXPERIENCE IN DEALING WITH ALL THESE

15  CASES, YOU ARE ONLY GETTING A NARROW SEGMENT OF PEOPLE

16  NECESSARILY WHO COME FORWARD AND MAKE CLAIMS.  BY COMING UP

17  WITH AN ALTERNATIVE METHOD TO REACH CLASS MEMBERS AND PROVIDE

18  THEM WITH THESE PRODUCTS, WE'RE DISTRIBUTING THE BENEFITS OF

19  THE SETTLEMENT TO A MUCH BROADER AUDIENCE.  AND I THINK THAT

20  THAT'S A SIGNIFICANT ROLE.

21      AND WE KNOW THAT THESE CLASS MEMBERS ALLEGED IN OUR

22  COMPLAINT, WE KNOW THEY WERE INTERESTED IN PRODUCTS THAT THEY

23  THOUGHT WERE HIGH PROTEIN PRODUCTS THAT DIDN'T CONTAIN A LOT

24  OF FAT AND LOW CALORIES, AND THAT'S WHAT THEY ARE GOING TO GET

25  WHEN THEY GET THE LIGHT PRODUCT DISTRIBUTED TO THEM AT THESE

1   EVENTS.

2       AND OUR CONSUMER RESEARCH EFFORTS DONE IN CONNECTION WITH

3   CLASS CERT IN THIS CASE FOUND THAT ABOUT 62 PERCENT OF CLASS

4   MEMBERS CONSUME THESE PRODUCTS WHILE AT ATHLETIC EVENTS OR IN

5   THE CONDUCT OF DOING SOMETHING ACTIVE LIKE THIS.  SO WE FELT

6   THAT PROVIDING IT AT THESE KINDS OF EVENTS IS A WAY YOU ARE

7   GOING TO FIND CLASS MEMBERS, ASIDE FROM JUST PUTTING OUT THE

8   NOTICE IN THE PAPER AND GETTING PEOPLE TO MAKE CLAIMS.

9           **THE COURT:**  OTHERWISE HOW ELSE WOULD YOU GET LARGE

10  GROUPS OF ATHLETES IN A SINGLE PLACE?  I SUPPOSE --

11          **MR. PIFKO:**  EXACTLY.

12          **THE COURT:**  -- GO TO GYMS, I GUESS, AND GIVE IT OUT

13  AT GYMS.

14          **MR. PIFKO:**  EXACTLY.

15      I WANTED TO COMMENT THAT MR. CHAMBERLAIN'S POINT THAT, OH,

16  WELL, CLASS MEMBERS HAVE TO GO AND SEEK THESE EVENTS OUT.

17  THAT'S THE TAIL WAGGING THE DOG.

18      WE ARE NOT TRYING TO GET THE SAME 33,000 PEOPLE JUST TO GO

19  TO THESE EVENTS.  WE ARE TRYING TO REACH OTHER PEOPLE WHO

20  DIDN'T KNOW ABOUT THIS ALREADY AND ARE GOING TO SEE IT WHILE

21  THEY'RE AT THE EVENT.  SO I ECHO THAT IT'S ANOTHER WAY TO

22  BROADEN THE DISTRIBUTION.

23      I ALSO WANTED TO NOTE AS FAR AS THE VALUE OF THE PRODUCTS

24  IN RESPONSE TO ONE OF MR. CHAMBERLAIN'S COMMENTS, THE

25  BLUETOOTH CASE ACTUALLY EXPRESSLY SAYS, AND ITS CITED THAT --

1   THE SAME POINT IS CITED IN MR. CHAMBERLAIN'S PAPERS THAT THE

2   SETTLEMENT SHOULD BE VALUED ON HOW MUCH THE BENEFIT IS TO THE

3   CLASS, NOT ON WHAT THE COMPANY HAS TO SPEND FOR THAT BENEFIT.

4       SO, LIKE MR. NIERLICH SAID, IT'S NOT SOME SORT OF PUNITIVE

5   OR HOW MUCH DOES IT HURT THE COMPANY, YOU'RE SUPPOSED TO VALUE

6   IT ON, BASED ON THE BENEFIT THE CLASS IS RECEIVING.

7       SO, HERE, THEY ARE RECEIVING PRODUCTS THEY OTHERWISE WOULD

8   HAVE HAD TO PAY OUT OF POCKET FOR THE RETAIL AMOUNT.  BY

9   GIVING THEM THAT FOR FREE, YOU ARE GIVING THEM THAT MONETARY

10  BENEFIT.

11      I WANTED TO RESPOND THAT WITH RESPECT TO THE INJUNCTIVE

12  RELIEF, IN THE NINTH CIRCUIT'S MOST RECENT RESPONSE TO ONE

13  MR. FRANK'S OBJECTIONS, THEY ACTUALLY SAID THAT IN REMANDING

14  TO THE DISTRICT COURT, THEY SAID THAT THE DISTRICT COURT

15  SHOULD ALSO CONSIDER THE VALUE OF THE INJUNCTIVE RELIEF IN

16  THIS PARTICULAR SETTLEMENT THAT WAS AT ISSUE.

17      SO I THINK FOR MR. CHAMBERLAIN TO SAY THAT THE COURT

18  SHOULDN'T CONSIDER IT IS ACTUALLY CONTRARY TO WHAT THE NINTH

19  CIRCUIT WANTS DISTRICT COURTS TO DO HERE.  I UNDERSTAND THAT

20  IT'S HARD TO PUT A SPECIFIC NUMBER ON IT, BUT THE COURT IS

21  SUPPOSED TO GIVE IT SOME CONSIDERATION.

22      AND I DO AGREE THAT, YOU KNOW, THE FDA DIDN'T REQUIRE THEM

23  TO DO ANYTHING.  WE -- ACTUALLY THAT WAS A POINT I THINK WE

24  LITIGATED IN THIS COURTROOM, AND I REMEMBER ARGUING WITH THEM

25  ABOUT WHETHER THE FDA HAD MADE A FINAL DETERMINATION ON THIS

1    ISSUE OR NOT.  AND ULTIMATELY THEY -- YOU KNOW, THE SECOND

2    LETTER THAT HE CITES WAS ABOUT -- THAT THEY WERE CHANGING

3    THEIR LABELS, WAS SENT TO THE FDA AFTER OUR CASE WAS FILED.

4        SO I THINK OUR CASE HAD AN IMPACT ON THAT DECISION WHICH,

5    AGAIN, THEY COULD HAVE GONE BACK ON IT ANY TIME.  HERE NOW,

6    UNDER THE SETTLEMENT, THERE'S AN INJUNCTION AND THEY ARE

7    REQUIRED TO MAKE THAT CHANGE.

8            **THE COURT:**  SO WHAT'S THE STATUS OF THE FDA NOW?  THE

9    FDA WAS SATISFIED BY THIS OUTCOME AND ISN'T PURSUING THEM

10   ANYMORE?

11           **MR. PIFKO:**  I WOULD HAVE TO LET MR. NIERLICH SPEAK TO

12   THAT, BUT IT'S MY UNDERSTANDING THEY JUST -- I DON'T BELIEVE

13   THEY HAVE PROVIDED A FURTHER RESPONSE.

14       AND TYPICALLY REGULATORY AGENCIES, AS YOU PROBABLY KNOW,

15   SAY OUR LACK OF RESPONSE DOESN'T MEAN THAT WE AGREE WITH

16   ANYTHING, WE'RE JUST AREN'T RESPONDING ANY FURTHER.  I WOULD

17   HAVE TO LEAVE THAT TO MR. NIERLICH.

18       I JUST WANT TO ALSO ADD THAT, YOU KNOW, AS FAR AS THE --

19   EVEN IF THE COURT WERE TO ACCEPT MR. CHAMBERLAIN'S VALUE OF

20   THE CASE, IF THERE'S NO -- I GUESS, YOU KNOW, MAYBE THAT WAS

21   WHERE YOU WERE GETTING WITH YOUR INITIAL QUESTION HERE, IF THE

22   COURT WERE TO APPLY -- THERE'S NO REASON WHY THE COURT JUST

23   COULDN'T APPLY THE LODESTAR FACTOR HERE.  HAD THIS SETTLEMENT

24   ONLY BEEN INJUNCTIVE RELIEF, WE COULD HAVE COME INTO THE COURT

25   AND SAID, OKAY, WE DIDN'T GET ALL THE OTHER THINGS THAT WE

1   GOT, BUT WE DID GET THEM TO CHANGE THE LABELS AND WE COULD

2   HAVE MADE A LODESTAR REQUEST FOR OUR FEES, AND THE COURT COULD

3   HAVE EVALUATED IT AS SUCH.

4       SO I JUST WANT TO SAY FOR ARGUMENT SAKE THAT EVEN IF YOU

5   WERE TO ACCEPT HIS VALUATION, I DON'T BELIEVE THAT THAT HAS TO

6   IMPACT THE COURT'S ANALYSIS ON THE CALCULATION OF THE ATTORNEY

7   FEE REQUEST.

8           **THE COURT:**  OKAY.  IF YOU CAN JUST ANSWER THE

9   QUESTION ABOUT THE STATUS OF THE FDA, IF YOU ARE ABLE TO TELL

10  US.

11          **MR. NIERLICH:**  SURE.  AND I DON'T WANT TO OVERSTATE

12  MY ONLY KNOWLEDGE TO THE COURT, YOUR HONOR, BUT IT'S MY

13  UNDERSTANDING THAT THE FDA HAS NOT ISSUED ANY REQUIREMENT TO

14  DO WHAT HAS BEEN DONE IN THE INJUNCTIVE RELIEF IN THIS CASE.

15          **THE COURT:**  THE FDA WAS NOTIFIED OF WHAT YOU HAD

16  DONE?

17          **MR. NIERLICH:**  I DON'T WANT TO OVERSTEP MY KNOWLEDGE

18  SPECIFICALLY, BUT IT WOULD BE SURPRISING IF THEY WEREN'T AWARE

19  OF THE LABELS AS THEY SIT IN THE MARKET TODAY.

20          **THE COURT:**  MR. CHAMBERLAIN, DID YOU HAVE ANYTHING

21  ELSE YOU WANTED TO SAY?

22          **MR. CHAMBERLAIN:**  NOT AT THIS TIME, YOUR HONOR.

23          **THE COURT:**  OKAY.

24      WELL, I'M INCLINED TO APPROVE THE SETTLEMENT.  I THINK

25  THAT ONE THING ONE HAS TO LOOK AT IN A SETTLEMENT OF A CLASS

1    ACTION CLAIM IS THE VALUE OF THE CLAIM AND THE LIKELIHOOD OF

2    SUCCESS AND THE LIKELIHOOD OF RECOVERY.

3        AND THIS CASE, I THINK, WAS QUITE A DIFFICULT CASE FOR THE

4    PLAINTIFF AS EVIDENCED BY THE TWO MOTIONS TO DISMISS WE HAD

5    AND I THINK A NUMBER OF THE CLAIMS WERE NOT ALLOWED TO

6    PROCEED.  AND EVEN THE ONES THAT WERE, HAD SUBSTANTIAL

7    CRITICISM LEVELED AT THEM, WHICH COULD HAVE WON THE DAY.  SO,

8    IT'S ALWAYS HARD TO MONETIZE THE VALUE OF CAUSES OF ACTION,

9    BUT IT CERTAINLY THERE WERE SOME DIFFICULT LEGAL ISSUES HERE.

10       SECONDLY, I WOULD SAY THAT THE INITIAL SETTLEMENT I DID

11   HAVE SEVERE PROBLEMS WITH, AS I THINK I STATED AT THE TIME,

12   AND SETTLEMENT WAS GREATLY IMPROVED IN RESPONSE TO THE

13   COMMENTS THAT I HAD MADE THE FIRST TIME AROUND, I THINK.

14       NEXT, I WOULD SAY WHILE IT IS EXTREMELY DIFFICULT TO VALUE

15   AN INJUNCTION, I DO PUT VALUE ON THIS INJUNCTION.  I CAN'T

16   MONETIZE IT, AGAIN, BUT I DO THINK IT WAS VALUABLE.  AND AS

17   SOMEBODY SAID, THE NOTICE ITSELF WAS VALUABLE, WHICH IS A

18   LITTLE BIT DIFFERENT FROM THE INJUNCTION, BUT IT IS A METHOD

19   WHEREBY PEOPLE WHO THOUGHT THEY WERE GETTING HEALTHY FOOD

20   PERHAPS WERE NOTIFIED THAT IT WASN'T AS HEALTHY AS THEY

21   THOUGHT, BOTH BY WAY OF THE NOTICE AND THEN PERHAPS BY WAY OF

22   THE INJUNCTION AND FURTHER BY WAY OF JUST THE CHANGES ON THE

23   LABELS.  AND THAT'S NOT ONLY FUTURE BUYERS, BUT PAST BUYERS.

24       SO, AGAIN, WHILE IT'S HARD TO SET A NUMBER ON IT, I DO

25   PLACE VALUE ON IT.

1    THE PRODUCT DISTRIBUTION, ONE COULD LOOK AT IN DIFFERENT

2    WAYS.  IT IS -- WILL GO TO AT LEAST PEOPLE WHO MIGHT HAVE BEEN

3    CLASS MEMBERS.  MANY OF THEM I'M SURE WERE CLASS MEMBERS.  IT

4    WILL HAVE SOME BENEFIT TO CLASS MEMBERS IN THAT THEY WILL EAT

5    MUSCLE MILK LIGHT AND DECIDE IT IS AS GOOD OR BETTER THAN

6    MUSCLE MILK NOT LIGHT, AND WILL BE, ONE HOPES, A BENEFIT TO

7    THEM.

8    THE INFORMATIONAL DEFICITS THAT LED TO THE DENNIS V.

9    KELLOGG OR KELLOGG V. DENNIS CASE, WHICHEVER IT IS, AREN'T

10   HERE BECAUSE THE SETTLEMENT RESPONDS TO THOSE ISSUES AND

11   ADDRESSES THEM.

12   ONE MIGHT QUESTION THE VALUE PLACED ON IT.  ONE MIGHT SAY

13   IT'S NOT WORTH RETAIL, AND MAYBE THAT'S TRUE, BUT IT'S

14   CERTAINLY OF VALUE.  IT'S OF VALUE TO THE PEOPLE WHO GET IT.

15   IT'S A VALUE TO -- TO THE EXTENT THEY'RE CLASS MEMBERS, IT'S A

16   VALUE TO CLASS MEMBERS.  TO THE EXTENT THEY ARE NOT CLASS

17   MEMBERS, I GUESS IT'S A VALUE TO THEM PERSONALLY.  AND JUST AS

18   SIDELIGHT, ALTHOUGH PERHAPS NOT ONE THAT'S MEANT TO BE

19   CONSIDERED, IT IS A VALUE TO THE CHARITABLE CAUSES THAT THESE

20   RACES ARE FURTHERING.

21   NOW, MAYBE WE ARE NOT SUPPOSED TO COUNT THAT, I, AT LEAST,

22   NOTE IT AS A GOOD THING, EVEN IF A SIDE EFFECT.

23   THERE WAS MENTION OF THE ALLOCATION ISSUES, AND THE FACT

24   THAT EVERYBODY GETS 30 BUCKS WHETHER THEY BOUGHT ONE BAR OR A

25   HUNDRED BARS.  AND THAT'S A CHOICE THAT WAS MADE.  COULD HAVE

1   BEEN MADE DIFFERENTLY, BUT I WOULD NOTE THAT -- AND I THINK

2   THIS MAY HAVE COME UP AT THE FIRST ATTEMPT AT SETTLEMENT, THAT

3   TO TRY TO VALUE IT BASED ON THE NUMBER OF PRODUCT BOUGHT, IF

4   ONE WERE TO THEN TIE THAT TO RECEIPTS.  YOU KNOW, THIS JUST

5   ISN'T THE KIND OF CASE WHERE PEOPLE DON'T KEEP RECEIPTS OF

6   THEIR CANDY BARS.  IT'S JUST -- IT WOULDN'T HAVE WORKED THAT

7   WAY.  WE WOULD HAVE HAD I'M SURE FAR LESS CLAIMS IF PEOPLE HAD

8   TO COME UP WITH THEIR RECEIPT FOR THEIR CANDY BAR THAT THEY

9   BOUGHT FOUR YEARS AGO.  IT WASN'T GOING TO HAPPEN.

10      AND IF THERE WEREN'T TO BE RECEIPTS, THEN IT DID RAISE

11  SOME ISSUES OF, I DON'T WANT TO SAY FRAUD, BUT ISSUES OF

12  OVERREACHING WHERE PEOPLE, IF THEY DON'T HAVE TO HAVE A

13  RECEIPT, CAN SAY HOWEVER MANY BOTTLES THEY WANT TO SAY, AND IT

14  SORT OF PLACES A PREMIUM ON THOSE WHO ARE WILLING TO

15  EXAGGERATE VERSUS THOSE WHO ARE SCRUPULOUSLY HONEST.  SO

16  THERE'S CERTAINLY AN ARGUMENT TO BE MADE FOR SIMPLY MAKING IT

17  A LUMP SUM RATHER THAN BASED ON WHAT YOU ARE WILLING TO SAY

18  YOU DID.

19      SO, I DON'T REALLY HAVE A PROBLEM WITH THE ALLOCATION.

20      I DO HAVE SOMEWHAT OF A PROBLEM WITH THE ATTORNEYS' FEES.

21  AND THE WAY I THINK THAT I WILL DEAL WITH THAT IS TO SIMPLY

22  AWARD WHAT YOU HAVE CLAIMED AS THE LODESTAR.

23      AND I RECOGNIZE YOU WILL PROBABLY SPEND MORE THAN THAT

24  BECAUSE YOU WILL HAVE FUTURE FEES AND I'M NOT GOING TO

25  CONTINUE TO PAY IT, BUT I'LL PAY THE $855,157.25, THE LODESTAR

1    AMOUNT PLUS THE COST AMOUNT, THE HUNDRED AND NINETY, WHATEVER

2    IT WAS, AMOUNT.

3        AND I DO THAT NOT ONLY BECAUSE IT'S THE LODESTAR, I THINK

4    THAT'S AN ADEQUATE REASON, BUT ALSO CROSS-CHECKING WITH THE

5    PERCENTAGE, AND VALUING IT, EVEN IF I DON'T VALUE IT AT

6    $5 MILLION, AS YOU DID, WHICH WOULD -- WHICH WOULD MAKE IT, I

7    DON'T KNOW, SOMETHING LESS THAN 19 PERCENT, AND EVEN IF I

8    DON'T VALUE IT AT $4 MILLION WITHOUT THE INJUNCTION AT ALL,

9    WHICH WOULD HAVE MADE IT MORE LIKE 24 PERCENT AT THE FULL

10   REQUEST, EVEN IF I CUT THE VALUE OF THE PRODUCT DISTRIBUTION

11   AND LEAVE OUT THE VALUE OF THE INJUNCTION, THE THING YOU WERE

12   ASKING FOR WAS 33 PERCENT, SO THIS IS LESS THAN THAT.

13       AND IT'S A BIT HOLISTIC, BUT GIVEN THE RELATIONSHIP OF THE

14   LODESTAR TO THE PERCENTAGE TO THE ROUGH APPROXIMATION OF THE

15   ACTUAL CASH PLUS THE SOMEWHAT SUBJECTIVE OR INTRINSIC VALUE OF

16   THE NONCASH PORTIONS, AND JUST PUTTING ALL THOSE TOGETHER, AND

17   WEIGHING IN THE DIFFICULTY OF THE CASE, I DO THINK THAT IT'S A

18   SETTLEMENT THAT SHOULD BE APPROVED.

19       SO, THAT'S MY INCLINATION.  IF ANYBODY HAS ANY LAST MINUTE

20   OBJECTIONS TO WHAT I'VE SAID OR LAST MINUTE CORRECTIONS, I

21   WILL LISTEN TO IT, BUT THAT'S MY INCLINATION.

22           **MR. CHAMBERLAIN:**  I HAVE A BRIEF COMMENT, YOUR HONOR.

23           **THE COURT:**  OKAY.

24           **MR. CHAMBERLAIN:**  SO, I GUESS THE MOST IMPORTANT

25   THING TO CONSIDER, LIKE -- I -- I DON'T KNOW HOW TO PUT THIS,

1    BUT THE NINTH CIRCUIT IN APPLE MAGSAFE REALLY IS INCLINED --

2    YOU KNOW, WANTS TO MAKE SURE THAT, UM, THE INDICIA OF

3    SELF-DEALING ARE DEALT WITH.  AND I THINK THAT -- I THINK

4    THAT -- I JUST REALLY THINK THAT THERE -- SINCE ALL THREE ARE

5    HERE, SINCE THERE IS THAT KICKER, I JUST REALLY DO THINK IT'S

6    SUBSTANTIVELY UNFAIR TO THE CLASS.

7        AND THE FACT THAT SOME CLASS MEMBERS WILL BENEFIT, I

8    REALLY DON'T THINK THAT'S GOOD ENOUGH, AND I THINK THAT THE

9    DENNIS AND BLUETOOTH REALLY DO PRECLUDE THAT.

10           THE COURT:  I WOULD BE GIVING THEM -- I WOULD BE

11   COMING TO MORE OR LESS THE SAME CONCLUSION, FRANKLY, EVEN IF

12   THERE WASN'T A PRODUCT DISTRIBUTION, TO TELL YOU THE TRUTH.

13           MR. CHAMBERLAIN:  OKAY.

14           THE COURT:  SO THAT ISN'T A BIG PART OF IT.  IT'S

15   BETTER TO HAVE IT THAN NOT HAVE IT, AND I VALUE IT SOMEWHAT

16   SIMILARLY EVEN IF THEY DIDN'T HAVE IT, SO I JUST AS SOON HAVE

17   IT THAN NOT HAVE IT.

18           MR. CHAMBERLAIN:  OKAY.

19           THE COURT:  ANYTHING ELSE FROM YOU ALL?

20           MR. PIFKO:  I HAVE NO FURTHER COMMENTS.  THE MAGSAFE

21   CASE DOES SAY, THOUGH, HOWEVER, DESPITE -- THE COURT CAN

22   CONSIDER THOSE ISSUES, AND THEN DECIDE I'VE THOUGHT ABOUT THEM

23   AND THEY ARE NOT AN ISSUE.

24           THE COURT:  OH, I HAVE THOUGHT ABOUT IT.  I HAVE

25   THOUGHT ABOUT THEM.

1        ANYTHING ELSE FROM YOU?

2              **MR. NIERLICH:**  YOUR HONOR, I HAVE NOTHING FURTHER,

3     BUT ONE PROCEDURAL QUESTION.

4        DO YOU WANT THE -- EITHER OF THE PARTIES TO SUBMIT A

5     REVISED PROPOSED ORDER TO TAKE INTO ACCOUNT WHAT HAS BEEN

6     DISCUSSED HERE OR IS THE COURT GOING TO ISSUE AN ORDER AND

7     SHOULD WE WAIT?  WHAT'S YOUR PREFERENCE?

8              **THE COURT:**  IT WOULD BE HANDY IF YOU COULD DRAFT A

9     PROPOSED ORDER.  I CAN'T USE THE ONE THAT YOU'VE GIVEN ME

10    ALREADY BECAUSE I'M NOT DOING EXACTLY THE SAME THING.

11       IF YOU THINK YOU CAN WRITE UP WHAT I JUST SAID AND INCLUDE

12    THE OTHER THINGS YOU THINK OUGHT TO BE THERE, I WOULD BE HAPPY

13    TO TAKE A LOOK AT WHAT YOU COULD COME UP WITH, AND THAT WOULD

14    SAVE ME SOME TROUBLE.

15             **MR. PIFKO:**  WE WOULD BE HAPPY TO SAVE YOU SOME

16    TROUBLE, YOUR HONOR.

17             **THE COURT:**  ALL RIGHT.  OKAY.

18             **MR. NIERLICH:**  THANK YOU, YOUR HONOR.

19             **MR. PIFKO:**  THANK YOU.

20             **THE COURT:**  THANK YOU.

21             (PROCEEDINGS CONCLUDED AT 3:07 P.M.)

22

23

24

25

1

2                     **CERTIFICATE OF REPORTER**

3          I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

4    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

5    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                    _Diane E. Skillman_

9          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

10                   FRIDAY, MAY 23, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25